## LUCAS v. STATE.

[67 South. 851.]

1. HOMICIDE. *Defenses. Self defense. Criminal law. Trial. Instructions. Appeal. Harmless error. Evidence. Admissibility.*
   It is not every act of aggression or provocation which produces a difficulty, and in the course of which a necessity to kill another arises, that will preclude the slayer from availing himself of the right of self-defense. If the defendant brought about the difficulty at a time when he was unarmed, and with no intention of inflicting death or great bodily harm upon deceased in the course thereof, he is not estopped from pleading the right of self-defense.

2. CRIMINAL LAW. *Instructions. Trial.*
   In a prosecution for homicide, the court should not by instruction call attention specifically to threats said to have been made by the defendant, against the life of the deceased and advised the

jury, that such threats may be considered in connection with the other testimony in arriving at a verdict. Though such an instruction is not of such a character as to, of itself alone, call for a reversal.

3. HOMICIDE. *Evidence. Admissibility.*
   In a trial for homicide, evidence that the deceased was trying to procure a pistol with which to kill defendant, was material in determining whether deceased or defendant was the aggressor in the difficulty which resulted in the death of deceased.

APPEAL from the circuit court of Yalobusha county. HON. FRED MONTGOMERY, Special Judge.

Ed Lucas was convicted of murder and appeals.

The instructions referred to are as follows:

No. 4: "To make out a case of self-defense four essential conditions are necessary: First. The party assaulted or seriously threateneed must not have brought about the difficulty. Second. He must believe at the time and under the circumstances that the danger of death, or serious bodily harm at the hand of his assailant is such as to render it necessary to take his assailant's life, or to save his own life, or to prevent serious bodily harm. Third. The circumstances must be such as to warrant such belief in the mind of an ordinary prudent person. Fourth. There must exist a real and apparent necessity to take life."

No. 6: "The court instructs the jury for the state that, even though they may believe from the evidence that the deceased made threats against the life of the defendant, such threats were not sufficient of themselves to justify him in making a felonious assault upon the deceased, and unless the jury believes from the evidence that at the time the fatal shot was fired the deceased was so conducting himself as to satisfy a reasonably prudent man that he was then about to take the life of the defendant, or to do him some great bodily harm, and that such action was not provoked by the then action and conduct of the defendant, the jury

should find the defendant guilty, notwithstanding you may believe the deceased had made threats against the life of the defendant. And the jurors are further instructed that if they believe from the evidence beyond a reasonable doubt that the defendant had made threats against the life of the deceased, such threats may be considered in connection with the other testimony in arriving at your verdict.''

*Creekmore & Stone*, for appellant.

We now come to the consideration of an assignment of error concerning matters that have been so constantly and persistently called attention to by this court that it almost seems unnecessary to cite the specific cases. We refer to the action of the court in giving this instruction on self defense for the state. We copy the instruction in full, which is No. ——, and marked "given" for the state.

To make out a case of self defense four essential conditions are necessary: first the party assaulted or seriously threatened must not have brought about the difficulty; second, he must believe at the time and under the circumstances that the danger of death or of serious bodily harm at the hands of his assailant is such as to render it necessary to take his assailant's life to save his own life or to prevent serious bodily harm; third, the circumstances must be such as to warrant such belief in the mind of an ordinarily prudent person; fourth, there must exist a real or apparent necessity to take life.

This represents another effort, so often condemned of the court to instruct the defendent out of the right to self defense, beginning by assuming a considerable portion of proof not supported by any evidence whatever, then by refusing to give defendant the benefit even under this assumption, of an abandonment of the diffi-

culty, and a retreat to his buggy. In effect, making the whole thing depend upon the assumption of who began the difficulty, and amounting to a peremptory instruction to convict this defendant. We quote a number of cases including *Wilburn case,* 73 Miss. 245, 18 So. 756; *Fore* v. *State,* 75 Miss. 727, 23 So. 710; *Johnson* v. *State,* 27 So. 880; *Lofton* v. *State,* 79 Miss. 723, 31 So. 420; *Rogers* v. *State,* 82 Miss. 479, 34 So. 320; *Pulpus* v. *State,* 82 Miss. 548, 34 So. 2; *Mosley* v. *State,* 89 Miss. 802, 41 So. 384; 2 Miss. Digest, "Homicide" 300G, pages 616, 617, and *Rogers* v. *State,* 34 So. 320.

These and all other decisions of the supreme court of this or any other state show beyond a doubt that this instruction is fatal error. As said above it amounted to a peremptory instruction to the jury to find the defendant guilty as charged, without setting out the facts by which his guilt was to be properly gaged, and improperly limited his right to the plea of self defense. We earnestly submit that the defendant is entitled to a reversal and a new trial.

*Ross A. Collins,* for the state.

The appellant raises several points in his assignments of error but at the very outset of his brief, states that he relies in the main on only three errors for a reversal of the case. The first of these was the refusal of the court to admit in evidence the testimony of Charlie Smith in regard to a conversation had with the deceased on Friday morning before the killing in which the deceased asked him, this witness, to let him have his pistol which had been pledged as security for a loan by this witness to the deceased. The entire evidence is set out on pages 72 and 73, of the record, and fails to show its relevancy in any respect. The witness testified that the deceased came to him and merely wanted to get his pistol but did not state to him that

he wanted it for any particular use nor did he utter any threats towards the appellant or any one else.

The second of the alleged errors relied on relates to the introduction of the rebuttal testimony of a state's witness, George Townsend, in which a threat by the appellant towards the deceased was told of. Appellant contends that this evidence should have been introduced on making out the state's case and that he was prejudiced by its introduction in rebuttal. This witness testified that the appellant had said that he was going to kill the deceased if it was the last thing he did, and stated that this statement was made to him at a certain time and under circumstances which the appellant, on his cross-examination, had been asked about and denied. This was perfectly competent testimony in rebuttal and its introduction was left to the sound discretion of the court. Appellant contends that this witness was the only one who had testified to anything showing a prior design on the part of the appellant to take the life of the deceased, but the record shows that George Townsend had previously testified for the state that the appellant told him immediately after the killing that he intended to kill the deceased even if he had to lay for him. The appellant could not have been prejudiced in any way by the introduction of this evidence in rebuttal.

The appellant's third complaint related to the instructions granted the state with particular reference to the one on page 89, of the record, which pointed out the essential conditions for a plea of self defense. This instruction is as follows: "To make out a case of self defense four essential conditions are necessary: First, the party assaulted or seriously threatened must not have brought about the difficulty; second, he must believe at the time and under the circumstances that the danger of death, or serious bodily harm at the hand of his assailant, is such as to render it necessary

to take his assailant's life, or to save his own life or to prevent serious bodily harm; third, the circumstances must be such as to warrant such belief in the mind of an ordinarily prudent person; fourth, there must exist a real or apparent necessity to take life.'' He urges as serious error the statement of the first condition above which states that the party assaulted or seriously threatened must not have brought about the difficulty. This condition, coupled with the other three, constitutes on the whole a correct enunciation of the law as the general, if not the universal, rule is that one who slays another to be justified or excused on the plea of self defense must have been without fault in provoking the difficulty for, as it has been said, a man has no right to provoke a quarrel and take advantage of it and then justify the homicide. For an authoritative discussion on this particular point, see Wharton on Homicide (3 Ed.), page 502.

SMITH, C. J., delivered the opinion of the court.

This is an appeal from a conviction of murder. Only two witnesses testified to the facts of the homicide, one of them being the defendant himself. The homicide occurred on Sunday morning.

According to the testimony of Cordelia Mitchell, the witness who testified in behalf of the state, she, her father, mother, and the deceased were on the gallery of the witness' home when the defendant drove up in a buggy, accompanied by the witness' sister Lula; that as they approached, the deceased asked who they were, and on being told said, ''It is a good time now to get the son of a bitch;'' that when the defendant and Lula reached a point in the road opposite the house they stopped, got out of the buggy, and approached the house, the defendant having with him a rifle; that when the defendant reached the gallery a conversation oc-

curred between him and the deceased which, according to the witness, was as follows:

"The first word I heard was, 'I heard what you were going to do with me,' and John he said, 'Do what?' and he said that he heard that he was going to kill him the next time he set eyes on him, and John said that he didn't say that, and came in the house, and Ed called him to come outdoors, and John whirled around, and I ran in the other room."

A few moments after the witness "ran in the other room" she heard a shot; and, on returning to the yard a few moments thereafter, the deceased was lying on the ground, on his back, in a dying condition, and the defendant had gotten into his buggy. A large pocket-knife, partly open, was lying on the ground near the deceased's right hand. According to the defendant's testimony, he did not see the deceased when he started into the house, and did not have with him his rifle, but left it in his buggy; that several persons had told him that the deceased had threatened to kill him, and that when he reached the gallery he said to him, meaning the deceased, "that I understood him to say that he was going to kill me;" that the deceased denied having said it, and that then the defendant told him, the deceased, "if you are going to kill me, to get away from there." What then transpired can best be told in the defendant's own language:

"I started back then, and he came on behind me. He comes down the gallery and I goes to the side of it. Q. What was he doing; what was his attitude? A. He came running behind me, and I went on to my buggy, and I ran on up to the buggy, and when I gets to the buggy I reached over and got my gun. Q. What was he doing at that time? A. He was coming after me with his knife. He had it in his hand. I threw the gun up then when he was coming on me and told him to stop, and he leans over this way and kept on coming, and I

shot. Q. What happened when you shot? A. I got back in the buggy, and he wheeled when I shot. Q. Did he run? A. No, sir; he fell. Q. When you shot what was his position towards you; the position of his hands and the knife? A. He had his knife after me, and he was about half bent over this way."

There was some evidence introduced on behalf of the state tending to show that from the nature of the wound, the ball must have entered the deceased's body from the rear, and some evidence introduced on behalf of the defense which tended to show that it must have entered the body from the front. There was also some evidence of statements made by the defendant, which may be said to have thrown some light upon his conduct, not material to be set out. Several witnesses also testified that both the defendant and the deceased had threatened to kill each other. The deceased owned a pistol which he had pawned to a man named Smith. The defendant sought to prove by Smith that on Friday before he was killed the deceased applied to him for his pistol, but that, not having the money with which to redeem it he, Smith, declined to let him have it; that the deceased then said he would get another, and that the witness then said to him, "Yes, you can get one, and you will fool around and get yourself killed," to which the deceased replied, "There will be a dead negro when I do." The deceased had told another witness that Smith would not let him have his pistol and that he knew the reason why, saying: "It was to keep me from killing Ed Lucas; that he wanted to kill him before now, and he said he didn't give a damn whether Mr. Smith gave him the pistol or not."

The granting of the state's fourth and sixth instructions, which the reporter will set out in full, is assigned for error. The objection to the fourth instruction is that the court thereby charged the jury that one of the essential conditions in order to make out a case

of self-defense is that "the party assaulted, or seriously threatened, must not have brought about the difficulty;" and to the sixth, that the court charged the jury that, in order for the defendant to plead self-defense, the conduct of the deceased must not have been "provoked by the then action and the conduct of the defendant." It is not the law that, in order "to make out a case of self-defense, . . . the party assaulted or seriously threatened must not have brought about the difficulty." A party assaulted is not estopped from pleading the right of self-defense, even though he may have "brought about the difficulty," unless it was "brought about" by him unlawfully; and, moreover:

"It is not every act of aggression or provocation which produces a difficulty, and in the course of which a necessity to kill another arises, that will preclude the slayer from availing himself of the right of self-defense; but it depends upon the character and quality of the act, and in some jurisdictions also upon the intent with which the difficulty was brought on." 21 Cyc. 806.

If the defendant "brought about" this difficulty at a time when he was unarmed, and with no intention of inflicting death or great bodily harm upon the deceased in the course thereof, and according to his testimony such may have been the fact, he is not estopped from pleading the right of self-defense according to the rule laid down in *Prine's Case,* 73 Miss. 838, 19 So. 711, and followed in *Lofton's Case,* 79 Miss. 732, 31 So. 420, and *Rogers' Case,* 82 Miss. 479, 34 So. 320. These instructions, therefore, should not have been given.

A further objection to the sixth instruction is that the court should not have thereby called attention specifically to the threats said to have been made by the defendant against the life of the deceased, and advised the jury "that such threats may be considered in con-

nection with the other testimony in arriving at your verdict." This objection to the instruction is well taken, but the error is not of such character as to of itself alone call for a reversal. *Cheatham* v. *State,* 67 Miss. 335, 7 So. 204, 19 Am. St. Rep. 310.

The testimony of the witness Smith should not have been excluded. The fact that the deceased was trying to procure a pistol from him with which, as he in effect stated to another, he intended to kill defendant was material in determining whether he or the defendant was the aggressor in the difficulty in which he lost his life.

*Reversed and remanded.*