602 So.2d 1185 (1992)
Robert THOMPSON, Sr.
v.
STATE of Mississippi.
No. 89-KA-1016.
Supreme Court of Mississippi.
July 8, 1992.
*1186 Jackson M. Brown, Starkville, James A. Walters, Walters & Easley, Columbus, for appellant.
Michael C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:
Robert Thompson, Sr. (Thompson) was indicted for the murder of Sammy Lee Clayburn (Clayburn) and was convicted of manslaughter in the Circuit Court of Lowndes County and sentenced to serve a term of twelve (12) years in the Mississippi Department of Corrections. Because of erroneous jury instructions, this case is reversed and remanded for a new trial.
Thompson owned and operated a lounge-bar in Lowndes County, which was located in a sheet metal building with a concrete floor. Pool tables, game machines, and a jukebox were located in close proximity to the bar, with tables and chairs for the patrons.
On December 14, 1987, Clayburn, who had a broken ankle and used crutches, visited the bar during the morning hours. According to Thompson, Clayburn "got some beer" and left. About an hour and a half later, Clayburn returned with a pistol stuck in his pants, and the following conversation took place:
And he asked me if I wanted to  to  to buy a pistol and I said, "I'd  I'd appreciate it if you'd take that outside and leave it in the car. This is no place for it." He said, "Where I go, my pistol goes." I said, "Well, Bo,[1] why don't both of you go then?" And he, uh, said, "You want to  will you pawn it?" I said, "I don't pawn anything here, Bo, and I want you to take the pistol and yourself and leave," because he seemed at this time that he had maybe had one too many. *1187 He, uh, again left, and uh, later the day  in the day he, uh, at what time I can't recall, he came back and still had the pistol. Again the same thing, I asked him to leave and to take the pistol. He replied in the same manner except he was more belligerent this time. Well my son came in. I had to run an errand to West Point, and my nephew had come in during this time and he went with me.
When Thompson returned from West Point, Clayburn was seated at one of the tables in the lounge. His head was slumped over and according to Walter Young, "he had one too many." There were several patrons of the lounge present at that time. Testimony of those present is somewhat less than harmonious. Thompson's recollection of the fatal shooting was:
When I came back he was still there. I walked in; he was at the table sitting right in front of the bar. I walked in and I said  and he looked at me, and I said, "Bo, I thought I told you to get out of here with that pistol," and he made the remark again, he said, "where I go, my pistol goes." I said, "Well, God damn it, you and that pistol both get out of here," and turned around and looked at Robbie and I said, "Robbie, call the law," and I went behind the counter. Willie D. Bash, Senior stood up, said, "Mr. Robert, ain't no need for that. We'll get him out of here." I looked at Robbie; Robbie had the phone in his hand. I said, "Robbie, wait a minute." I looked at Willie D. I said, "Ya'll go ahead and get him out of here." Well Bo was standing at this time; he wasn't about to listen to them. The did  he just would not listen, and he started reaching for that pistol. I said, "Bo, don't  don't pull that pistol out. Don't put your hand on the pistol." I said, "Because I've got one too. Just leave." Well he made a motion and to my thinking he was going to pull the pistol on me. I pulled mine out and laid it on the counter while he was still looking at me so he would see that I was  I had a pistol. And the man  "I don't know what was wrong," I said, "For God sakes, don't pull that pistol," and out it came and was pointed at me and he was coming up pointing at me, I pulled my pistol and fire. That was the events of that day.
However, the testimony of Willie Bash, Jr., was:
Q ... when you spoke of your father and you, uh, attempting to get Sammie Bo Clayburn out of the place. Do you recall that?
A I do.
Q Did you and your father attempt to get him to leave?
A Yes. We were trying to get  trying to make him come out of the place and leave.
Q All right. Well where was he when you were doing this?
A He was standing right at the table.
Q Did he resist you?
A No. He didn't even try to resist nor nothing.
Q Did he pull away from you?
A No, He didn't.
Q Did he tell you that he wouldn't go?
A No, he didn't.
Q Then why were you not able to get him out of there?
A Because no soon  no soon we was trying to get ready to get him out of there, and then Mr. Thompson said, "More than you have a gun." And that's when he cocked his gun and throwed down. When he throwed the gun down, my old man  my  meaning my father, backed up. Then I backed up, and then I started tipping towards the door.
Walter Young testified:
Q Now I ask you, Mr. Young, did you see Robert Thompson point a gun at Bo Clayburn?
A That's correct.
Q Where was he standing when he pointed the gun at Bob Clayburn?
A He had, uh, walked out from behind the bar and, uh, when I heard the gun click, that's when I looked back around and he had it like this.
Q Pointed out at him?

*1188 A Pointed out at him.
* * * * * *
Q Let me ask you this: Did you see Bo Clayburn with his left hand held out holding a gun?
A No.
Q Did you see Bo Clayburn with his right hand pointed out with a gun towards 
A No.
Q  the Defendant? Did you see Bo Clayburn's crutches?
A Had them up under his right shoulder.
Q Where they up under the cup of his shoulder?
A Up under here.
Willie Lee Henry testified that when the fatal shots were fired, Clayburn was not saying or doing anything, his right hand was on the side, his left hand was down, he had nothing in either hand, and he was not reaching with any hand for anything.
Clayburn was shot twice with a .22 caliber pistol fired by Thompson. One bullet entered the front of his neck, and another struck his chin and entered his chest. Clayburn died from these wounds. Law enforcement officers called to the bar found Clayburn lying on the floor in a pool of blood with a .32 caliber pistol underneath him.
During trial, Thompson elicited on cross-examination of Walter Young, a State witness, that a relative of Clayburn had cut Thompson's throat on an earlier occasion. Merle Morton testified that some two weeks prior to the fatal occurrence, Clayburn told Morton there was a conflict between Thompson and two cousins of Clayburn and that he [Clayburn] was going to shoot Thompson. On cross-examination, Morton stated that the cousins' conflict with Clayburn resulted from some trouble they had started in the lounge.
Thompson attempted to testify about the details of the trouble between himself and Clayburn's cousins. Objection to the relevancy of this testimony was sustained by the trial court. No proffer of that testimony was made outside the presence of the jury.
Thompson appeals assigning three errors:
1. The trial court committed reversible error in refusing to admit testimony offered by Thompson of prior difficulties with cousins of Clayburn;
2. The jury was inadequately and improperly instructed on the issue of self-defense, aggressiveness, and trespass; and
3. The verdict of the jury was against the overwhelming weight of the evidence.

I.

EVIDENCE OF DETAILS OF PRIOR DIFFICULTY
Thompson's argument about the trial judge's refusal to permit testimony showing that Clayburn had resumed a previous difficulty his relatives had with Thompson is without foundation because:
(a) No proffer of the excluded testimony was made by Thompson in order to preserve the point for appeal;
(b) Thompson already had before the court and jury testimony showing (1) that one of Clayburn's relatives had cut his throat, (2) that conflict existed between Thompson and Clayburn's cousins, and (3) that Clayburn had threatened to shoot Thompson.
We adhere to the rule that a record proffer of excluded testimony must be made to preserve the point for appeal. Gates v. State, 484 So.2d 1002, 1008 (Miss. 1986).
Also, ample evidence of the prior difficulty between Thompson and Clayburn's relatives, as well as the threat made by Clayburn, were already before the jury. Details of the previous difficulty were not admissible. Ladner v. State, 197 So.2d 257, 263 (Miss. 1967); Hardy v. State, 143 Miss. 352, 108 So. 727 (1926).
This assignment of error is without merit.

*1189 II.

JURY INSTRUCTIONS
Over objections by Thompson, the trial court granted the following instructions assigned as error on appeal:
INSTRUCTION S-6
The Court instructs the jury that mere trespass or refusal to leave the Artesia DX bar is insufficient provocation to warrant the use of a deadly weapon in evicting Bo Clayburn. If you find from the evidence that the defendant provoked the encounter with Bo Clayburn, and that the defendant armed himself with a gun in advance, intending if necessary to use the gun to overcome Bo Clayburn, then the defendant has deprived himself of the right of self defense.
INSTRUCTION S-7
One who is the aggressor in a confrontation may not claim the right of self defense so long as he remains the aggressor and does not withdraw from the confrontation. If you find from the evidence that the defendant was the aggressor in this matter and brought on the difficulty with Bo Clayburn, and that he entered the encounter with a gun, intending to use it when he provoked or brought on the encounter, if necessary to overcome Bo Clayburn in the course of the encounter, then the defendant may not claim the right of self defense.
An examination of the record reveals there was no evidence to undergird the instructions. Thompson was owner-operator of a lounge engaged in the business of selling intoxicating liquor to patrons. His business also offered patrons use of pool tables and game machines. Common sense dictates that it is not unusual for one in Thompson's position and surroundings to maintain access to a pistol or other type of firearm on exceedingly short notice of its need.
On the other hand, Clayburn had "lounged" around the premises most of the day armed with a loaded pistol. He tried to sell or pawn it to Thompson who declined and requested Clayburn to "take that outside and leave it in the car." Clayburn replied by stating, "Where I go, my pistol goes." Thompson then requested Clayburn to take his pistol and leave. When Thompson returned from his trip to West Point, Clayburn was still in the lounge, intoxicated, and in possession of the pistol.
The stage was set for confrontation between the parties. The ensuing fatal encounter involves disputed facts. The jury should have been properly instructed on the issue of self defense. There was no evidentiary basis for the instructions preempting Thompson of his self defense theory. We have consistently, painstakingly, and repeatedly cautioned and admonished bench and bar that instructions such as S-6 and S-7 should be given only in the exceedingly rare circumstances where the facts meet all the required elements necessary to preempt a defendant's right to claim self defense. Williams v. State, 482 So.2d 1136, 1138-39 (Miss. 1986); Barnes v. State, 457 So.2d 1347 (Miss. 1984); McMullen v. State, 291 So.2d 537 (Miss. 1974); Patrick v. State, 285 So.2d 165 (Miss. 1973); Craft v. State, 271 So.2d 735 (Miss. 1973); Ellis v. State, 208 So.2d 49 (Miss. 1968); and Tate v. State, 192 So.2d 923 (Miss. 1966). See also; Thompson v. State, 190 Miss. 639, 200 So. 715 (1941); Brown v. State, 186 Miss. 734, 191 So. 818 (1939); Vance v. State, 182 Miss. 840, 183 So. 280 (1938); Coleman v. State, 179 Miss. 661, 176 So. 714 (1937); Lee v. State, 138 Miss. 474, 103 So. 233 (1925); Adams v. State, 136 Miss. 298, 101 So. 437 (1924); Garner v. State, 93 Miss. 843, 47 So. 500 (1908); Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903); Lofton v. State, 79 Miss. 723, 31 So. 420 (1902); and Prine v. State, 73 Miss. 838, 19 So. 711 (1896).
The record in this case is devoid of proof that Thompson armed himself with a firearm and provoked the encounter with the intent to use the weapon to overcome Clayburn. Moreover, all of us recognize that a wrongful act provoking a fatal encounter does not by itself deprive one of self defense. In Lucas v. State, 109 Miss. 82, 90, 67 So. 851, 852 (1915), this court stated:

*1190 It is not every act of aggression or provocation which produces a difficulty, and in the course of which a necessity to kill another arises, that will preclude the slayer from availing himself of the right of self-defense; but it depends upon the character and quality of the act, and in some jurisdictions also upon the intent with which the difficulty was brought on.
In McMullen v. State, 291 So.2d 537 (Miss. 1974), we reversed to prevent "manifest injustice" when an instruction in the abstract preempting self defense was granted and the defendant made no objection at trial.
The words of wisdom set out in Lofton v. State, 79 Miss. 723, 734, 31 So. 420, 421 (1902) are worth repeating:
This form of charge, declaring a defendant estopped to plead self-defense, is an exceedingly unwise one to be given. We have repeatedly condemned it, as shown by cases cited in the very able brief of counsel for appellant. It can never be proper, save in the few very rare cases where the case is such, on its facts, that a charge can be given embracing all the elements  not part of them, nor nearly all of them  essential to the estoppel. The old paths are the safe paths. The juries of the country can be safely trusted to find any defendant guilty whose case is really so bad as to estop him to plead self-defense, without resort  dangerous and unwise  to the metaphysical subtleties necessarily involved in the preparation of a proper charge of that sort. Once more we repeat (hoping that "here a little and there a little, line upon line, and precept upon precept" may at last do their work) that if prosecuting attorneys will ask few and very simple charges, and trust more to the common sense and sound judgment of the juries of the country, they will expose their circuit judges to far less risk of reversal, secure just as many convictions, and have far  very far  fewer cases reversed.
Ninety years after this Court spoke to this issue in Lofton v. State we find ourselves again reminding the bench and bar of this State that those who are ignorant of their history are condemned to repeat it. The bench and bar have an obligation to provide juries with proper, uncomplicated and understandable instructions. This is what Lofton and its progeny were all about, although the articulation apparently remains unheeded. The admonitions of Lofton are a line drawn in the sand and they are clear and visible.
We again say to the bench and bar that an instruction estopping one from asserting self defense is never proper except in the few rare cases where all the elements of estoppel are clearly present. The reason for permitting a self defense theory to be decided by a jury far out-weighs the reasons for estopping one from asserting this most basic right. The right of self defense is firmly ingrained in the common law and our heritage. This alone should persuade prosecutorial authorities to stop, think, ponder, and assess the facts carefully, before running the risk of reversal by requesting this often condemned charge.
We do not forget the rule that if instructions correctly state the law when read together as a whole, there is no reversible error. Roberts v. State, 458 So.2d 719, 721 (Miss. 1984); Hickombottom v. State, 409 So.2d 1337 (Miss. 1982); Anderson v. State, 397 So.2d 81 (Miss. 1981); Norman v. State, 385 So.2d 1298 (Miss. 1980). Also, if an error in one instruction is cured by another when the instructions are considered as a whole, the error will not be reversible. Roberts, at 721; Church v. State, 288 So.2d 855 (Miss. 1974) (Appeal after remand), 317 So.2d 386 (Miss. 1975), cert. den., 423 U.S. 1016, 96 S.Ct. 450, 46 L.Ed.2d 388 (1975).
Here Thompson requested and was granted two self defense instructions in the form attached as Appendix "A" to this opinion. The granting of these instructions, however, was insufficient to cure the court's error in granting S-6 and S-7 because we also recognize the rule that "when the court gives inconsistent instructions on a material issue, this violates the principle that the instructions must not mislead the jury and therefore must be consistent and harmonious. The fact that one instruction is correct does not cure the error in giving another that is inconsistent *1191 with it." Smith v. United States, 230 F.2d 935, 939 (6th Cir.1956). See also Perez v. United States, 297 F.2d 12 (5th Cir.1961). Furthermore, "the jury should not be required to determine which part of a contradictory charge is correct." Polansky v. United States, 332 F.2d 233, 236 (1st Cir.1964).
Here, the defense instructions told the jury that if certain facts existed the accused had the right to be acquitted because of self defense. The State's instructions then told the jury that it makes no difference if the facts set forth in the defense instructions exist; that the defendant had no right to claim self defense if facts (not supported by the record) were found. The jury should not be placed in this type of predicament while deciding a citizen's fate. When read together the State and defense instructions do not correctly state the law under the adduced evidence and resolved facts. The evidence does not support State Instructions S-6 and S-7. The defendant's instructions on self defense cannot cure the State's deficiency. The instructions under these circumstances are conflicting and the error occasioned by the granting of them is reversible. We therefore reverse and remand this case for a new trial.
REVERSED AND REMANDED TO THE CIRCUIT COURT OF LOWNDES COUNTY, MISSISSIPPI, FOR A NEW TRIAL.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, PITTMAN, BANKS and McRAE, JJ., concur.
PRATHER, J., not participating.

APPENDIX A

In the Circuit Court of Lowndes County, Mississippi

State of Mississippi

versus

Robert Thompson, Sr.

No: 10-467

D INSTRUCTION NO. 2
The Court instructs the jury that an owner of his business being on the premises where he has a right to be, may act in defense of himself and his business. When an owner, so situated, is confronted with a threatened assault is not required to retreat in the face of such threatened assault, regardless of its character, and may stand his ground, to repel force with force and may increase his force, so as not only to resist but also to overcome the assault. Now if you find from the evidence in this case that Robert Thompson was the owner of the DX and was faced with a threatened assault by Sammie Lee Clayborn, then in that event Robert Thompson had no duty to retreat but was entitled to stand his ground and repel the force of Sammie Lee Clayborn with force, so as not only to resist but to overcome the assault.
A person has the right to preserve peace in his place of business and may by force, if necessary, evict persons guilty of misbehavior, and a person who is the aggressor and at fault may not resist the right of the owner to evict.

D INSTRUCTION NO. 8
The Court instructs the jury that Robert Thompson was not under an obligation to wait to see if Sammie Lee Clayborn was going to shoot him before he took action to defend himself from an attack by Sammie Lee Clayborn and if you find from the evidence that Robert Thompson shot and killed Sammie Lee Clayborn without knowing for certain that Sammie Lee Clayborn was about to shoot him, and that it was reasonably apparent to a reasonable well disposed man of average prudence that Sammie Lee Clayborn was in the act of trying to shoot Robert Thompson, then you shall find the defendant not guilty.
NOTES
[1] Bo was the nickname for Clayburn.