# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01194-COA

**FRED HARRELL**                                                                       **APPELLANT**

v.

**STATE OF MISSISSIPPI**                                                           **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/12/2013 |
| TRIAL JUDGE: | HON. JOHNNIE E. WALLS JR. |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF ATTEMPTED AGGRAVATED ASSAULT AND SENTENCED TO SIX YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, FOLLOWED BY THREE YEARS OF POST-RELEASE SUPERVISION |
| DISPOSITION: | AFFIRMED – 12/02/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**IRVING, P.J., FOR THE COURT:**

¶1.     A Tunica County jury convicted Fred Harrell of attempted aggravated assault, and the

trial court sentenced him to six years in the custody of the Mississippi Department of

Corrections, followed by three years of post-release supervision.  Harrell filed a motion for

a judgment notwithstanding the verdict or, in the alternative, a new trial, which the trial court denied. He now appeals, arguing that (1) the trial court erred by excluding evidence showing that he was threatened by the victim before the incident at issue took place, and (2) the trial court erred by excluding evidence of the victim's propensity for violence. For the reasons that follow, we affirm the judgment of the trial court.

FACTS

¶2. Jeraldean Daniel and Leonard Davis co-manage D&D Truck Stop in Tunica, Mississippi. The truck stop consists of a diner and a tire shop. James Daniel and Dennis Daniel, Jeraldean's brothers, are both part-owners of the truck stop. James and Dennis also own a farming business in Tunica. Harrell, a long-time friend of Jeraldean, James, and Dennis, worked for James and Dennis as an employee in the farming business. Harrell and Leonard knew of each other through their associations with Jeraldean, James, and Dennis, and Harrell often ate breakfast at the diner.

¶3. On October 24, 2014, Harrell ate breakfast at the diner and was waited on by Jeraldean. Before leaving to work on a combine harvester with Dennis, Harrell made a sexually explicit comment to Jeraldean. According to Jeraldean, Harrell also touched her inappropriately. Jeraldean repeated the comment to Leonard, her boyfriend, when Leonard visited the truck stop that morning. She also informed Leonard that Harrell had touched her. After learning of Harrell's conduct, Leonard left in his truck to find James in order to report Harrell's conduct to James. Due to previous verbal altercations between Leonard and Harrell, Leonard elected not to speak with Harrell directly, believing that it would be less

2

problematic if James addressed the situation.

¶4.     While driving, Leonard met Dennis, who was traveling in the opposite direction towards the combine. Leonard and Dennis stopped their trucks in the road so that Leonard could speak with Dennis. At the time, unbeknownst to Leonard, Harrell was riding in the bed of Dennis's truck. As Harrell listened from the bed of Dennis's truck, Leonard informed Dennis of Harrell's conduct at the diner and told Dennis, "I feel like if you all don't talk to [Harrell] and do something with [Harrell,] it is going to be a problem at the store."

¶5.     The location where Leonard and Dennis met in their trucks was a short distance from the combine, where Dennis decided to drive after finishing his conversation with Leonard. Leonard followed in his truck. After Dennis parked his truck, Harrell jumped from the bed of the truck to the ground, landing near the back passenger side. Harrell opened the back passenger-side door and retrieved Dennis's .22 caliber rifle, which Harrell aimed in Leonard's direction and fired once. Leonard was not injured.

¶6.     At trial, during direct examination of Harrell, Harrell's counsel sought to adduce testimony that, prior to Harrell's retrieving the rifle and firing it in Leonard's direction, Leonard had allegedly threatened Harrell, which caused Harrell to fear for his life. The trial court sustained the State's objection to this testimony on the ground that it constituted inadmissible hearsay. However, as will be shown in the discussion portion of this opinion, the trial court later allowed the testimony that it had disallowed earlier, thereby eliminating any potential prejudice to Harrell.

¶7.     Also, during cross-examination of Leonard, Harrell's counsel sought to adduce

3

testimony of a previous altercation, involving Leonard and another individual,[1] to show that Harrell reasonably feared for his life at the time the incident at issue occurred. The State objected, arguing that evidence of Leonard's criminal history was inadmissible. The trial court sustained the objection but, nevertheless, allowed Leonard to testify as to the altercation.

¶8.     As stated, at the conclusion of the trial, the jury found Harrell guilty of the aggravated assault of Leonard.

DISCUSSION

¶9.     "This [c]ourt reviews the trial court's admission or exclusion of evidence for an abuse of discretion." *Tate v. State*, 912 So. 2d 919, 930 (¶32) (Miss. 2005) (citing *Herring v. Poirrier*, 797 So. 2d 797, 804 (¶18) (Miss. 2000)). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Pham v. State*, 716 So. 2d 1100, 1102 (¶12) (Miss. 1998) (citing *Terrain Enters. Inc. v. Mockbee,* 654 So. 2d 1122, 1131 (Miss. 1995)).

   I.     *Exclusion of Evidence of Threat*

¶10.    As noted, Harrell argues that the trial court erred by excluding evidence of a threat by Leonard prior to his firing a rifle in Leonard's direction and by excluding evidence of Leonard's propensity for violence. In response to the State's hearsay objection during trial, Harrell argued that he was not introducing evidence of Leonard's alleged threat to prove the

---

[1] Testimony revealed that Leonard was involved in a physical altercation with a truck-stop patron nearly two years prior to the incident involving Harrell.

truth of the matter asserted, but to show Harrell's state of mind at the time Harrell retrieved the rifle. The trial court sustained the State's hearsay objection, but nevertheless allowed testimony of the alleged threat, as shown by the following colloquy between Harrell's counsel and Harrell:

Q.     Did you hear any conversation between [Leonard Davis] and [Dennis]?

A.     Yes, I did.

Q.     Did that conversation involve you?

A.     Yes, sir.

Q.     When you heard that conversation, how did that make you feel?

A.     Well[,] I didn't even know he was talking to me. And then when he said -- when he pulled off from [Dennis], he -- me and him made eye contact.

****

Q.     When he made eye contact with you, what happened?

A.     He said[,] "I'm talking to you m----- f-----." That was his word.

COURT:     That is sustained. You cannot testify in that manner as to what someone has said.

Q.     Did Mr. Davis say anything to you?

****

A.     Yes, sir.

Q.     What did you do?

****

A.     I made a statement back to him.

5

Q.      What did you say to him?

A.      I told him[,] "F--- you."

Q.      What did Mr. Davis do?

A.      [He] [t]urned [his truck] around and come [sic] back up there where we went on up there [to the combine].

Q.      What happened then?

A.      Mr. Davis pulled his truck [to] the side. We pulled [around to] the back. I slid in the truck and watched Mr. Davis reach on his seat towards his glove compartment and start to get out of the truck. That is when I jumped off the back of the truck -- run [sic] around to the side -- opened the door and got the rifle out of there.

Q.      Why did you go get the rifle?

A.      [Davis] [t]hreatened me.

                                        ****

Q.      He threatened me.

A.      How did he threaten you?

PROSECUTOR:     Your Honor.

Q.      How did he threaten you? What did he do?

THE COURT:      The objection is sustained.

DEFENSE COUNSEL:     Your Honor, the question is, what did he do?

THE COURT:      All right. What did you do when you were threatened by Mr. Davis?

A.      Mr. Davis said he was going to -- I mean.

6

DEFENSE COUNSEL:    Let me stop you.  What did he do?  Describe his actions?

A.    I can't say what he said.  I'm trying to say --

Q.    What did he do?

A.    What did he do?  He -- he -- we had eye-to-eye contact.  *And his statement made me say what I said.*  Then[,] he turned his truck around and came back up there.

Q.    Was he in his truck?

A.    He was getting out of his truck.  I sat on the back of the truck [until] I seen [sic] him open his door -- reach on the -- like he was going in the glove compartment or on his seat to get something and was -- you know -- coming to get it out of his truck.  That is when I reacted -- jumped off the truck -- went around -- opened the door and grabbed the gun.

(Emphasis added).

¶11.    "The law [is clear] that 'if the significance of a statement is simply that it was made and there is no issue about the truth of the matter asserted, then the statement is not hearsay.'" *Arnold v. State*, 809 So. 2d 753, 758 (¶17) (Miss. Ct. App. 2002) (quoting *Mickel v. State*, 602 So. 2d 1160, 1162 (Miss. 1992)).  Accordingly, we find that the trial court erred by sustaining the State's objection to the admissibility of Leonard's alleged threat based on hearsay.  However, we find that the erroneous ruling did not result in any prejudice to Harrell, as the jury was informed of Leonard's alleged threat through the testimony of other witnesses.  Moreover, although Harrell has characterized Leonard's statement to him as a threat, it clearly was not.  It is more accurate to say that Leonard cursed at Harrell rather than threatened him.  And to the extent that Harrell may be referencing the conversation between

7

Leonard and Dennis that Harrell overheard, it is also clear that the jury was made aware of that conversation. This issue is without merit.

¶12. The dissent takes issue with our finding that Harrell was allowed to give his full version of the events in spite of the trial court's ruling. More specifically, the dissents points out that "Harrell was improperly interrupted numerous times by either the prosecutor or the trial judge when trying to testify about the events, and the impact highly prejudiced his defense." Dissenting Op. at (¶22). The dissent then re-quotes a portion of the testimony that we have quoted above and insists that "[t]he threat at issue was made when Leonard did not know Harrell was in the bed of Dennis's truck."

¶13. With respect, we must say that the dissent has totally misconstrued the record. The record is clear that the only conversation that took place when Dennis and Leonard were stopped on the side of the road was a conversation between Dennis and Leonard, not a conversation between Leonard and Harrell. And what Leonard said to Dennis in that conversation is this: "Well Fred [Harrell] has disrespected Dean [(Jeraldine, Leonard's girlfriend)] up at the store and been talking all underneath her clothes and stuff. I feel like if you all don't talk to Fred [Harrell] and do something with Fred [Harrell,] it is going to be a problem at the store." Harrell explains that when he overheard that conversation, he did not even know that Leonard was talking about him. However, when Leonard and Dennis pulled off from the side of the road, Leonard and Herrell made eye contact, and that is when Leonard said to Herrell, "I am talking to you m-----f-----," and Harrell responded, "F--- you." The record clearly shows that Leonard's statement—that Dennis needed to do something

8

with Harrell because of the way Harrell had talked to Leonard's girlfriend, or it was going to be a problem at the store—was admitted into evidence through the testimonies of Leonard and Dennis. Apparently, this is the statement that the dissent implicitly characterizes as the threat that Harrell was not allowed to testify about. While it is true that Harrell was not allowed to repeat the conversation that he heard between Leonard and Dennis while Harrell was in the bed of Dennis's truck, as stated, both Dennis and Leonard testified as to the content of the conversation, that being that Leonard told Dennis that Dennis needed to do something about his employee, Harrell, or there was "going to be a problem at the store." Therefore, despite the dissent's insistence otherwise and the various erroneous rulings by the circuit court, the alleged threat was in fact testified to before the jury.

¶14.    But assuming that there was some other verbal threat made by Leonard to Harrell that the circuit court erroneously excluded, we could not consider the error in this appeal because it was not preserved for appellate review, as Harrell did not make a proffer at the trial court level of the evidence that allegedly was excluded. *Thompson v. State*, 602 So. 2d 1185, 1188 (Miss. 1992). In *Thompson*, the defendant attempted to testify about the details of some trouble between himself and some other individuals. The prosecutor objected on the basis of relevancy, and the trial court sustained the objection. No proffer of the proposed testimony was made. *Id*. On appeal, the defendant assigned as error the trial court's refusal to allow the testimony by the defendant regarding the details of the trouble between him and the other individuals. In holding that the error had not been preserved for appellate review, the Mississippi Supreme Court stated: "We adhere to the rule that a record proffer of

9

excluded testimony must be made to preserve the point for appeal." *Id*. (citation omitted).

¶15. This Court recently affirmed the necessity of a proffer being made at the trial court level to preserve for appellate review an issue of improper exclusion of evidence:

> Generally, when a party seeks to offer evidence which in turn is excluded by the trial court, before we will consider the matter on appeal the party must have somehow placed in the record the nature and substance of the proffered evidence for our consideration. When testimony is excluded at trial, a record must be made of the proffered testimony in order to preserve the point for appeal.

*Barron v. State*, 130 So. 3d 531, 539-40 (¶32) (Miss. Ct. App. 2013) (internal citations and quotation marks omitted).

II.  *Exclusion of Evidence of Leonard's Propensity for Violence*

¶16. Harrell also argues that the trial court erred by excluding evidence of Leonard's propensity for violence by limiting Leonard's testimony "about Leonard beating up a supposedly unruly patron of the truck stop." However, the record belies Harrell's assertion. When Harrell's counsel attempted to elicit testimony from Leonard regarding the incident, the State objected. The trial court excused the jury and allowed Harrell's counsel to interrogate Leonard regarding the incident. Following the interrogation outside of the presence of the jury, the trial court brought the jury back in and allowed Harrell's counsel to elicit the following testimony from Leonard regarding the incident:

Q.  Mr. Davis[,] you had an altercation at the store[,] [c]orrect?

A.  Yes, sir.

Q.  What happened?

10

A.      I was sitting . . . outside . . . the store.

****

I was on the telephone with my brother who lives in Memphis. . . . And I was trying to get a tire deal set up where . . . he could deliver me some tires.

****

I can't think of his name[,] but this guy came in.  And he went -- he said something as he went by.  And I just kind of let it blew [sic] in one ear and out the other.  He went over -- on over to the beer counter.  And he got a 24 ounce can of some type of beer. [He] come [sic] back and he sat [sic] it on the counter.  And he started out the door.  And he says, "Are you going to get up?"  He said -- no I remember what.  He says, "Are you going to charge this beer to me" is what he said.

And I -- when he said that I says "you have got to see Junior."  As he start[ed] out the door[,] and he says[,] "Well [expletive] are you going to wait on me or you're going to charge the beer[?]"

And I said[,] "The best thing you can do is go on out that door where Junior is."  When he turned around and came back[,] . . . he met me at the door.

Q.      What did you do?

A.      I gave him [what] he ask[ed] for.

Q.      What did he ask for?

A.      A right to his jaw.

Q.      How many rights to his jaw?

A.      It [sic] hit him one time in his jaw.

¶17.   As shown, the trial court did not exclude evidence of the incident that Harrell claims demonstrates that Leonard has a propensity for violence.  However, even if the trial court had

11

done so, we would find no error, as Harrell had not established a predicate for admission of that type of evidence. This issue is without merit.

¶18. Having found no merit in either of the issues raised by Harrell, we find that he received a fair trial and that the judgment of the trial court should not be disturbed.

¶19. **THE JUDGMENT OF THE TUNICA COUNTY CIRCUIT COURT OF CONVICTION OF ATTEMPTED AGGRAVATED ASSAULT AND SENTENCE OF SIX YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, FOLLOWED BY THREE YEARS OF POST-RELEASE SUPERVISION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TUNICA COUNTY.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR. BARNES, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**BARNES, J., DISSENTING:**

¶20. While I agree with the majority that the trial court erroneously excluded Harrell's attempted testimony of Leonard's alleged threat, I cannot agree that Harrell's ultimate reference to a generic threat cured the error. The trial court did not allow Harrell to testify as to the specifics of the alleged threat he overheard when Leonard was speaking to Dennis. I find that the prosecutors' and trial court's errors interrupting and precluding Harrell's testimony when he was trying to present his defense severely prejudiced Harrell. I would reverse and remand for a new trial.

¶21. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). All too often, we see records where a witness is informed he "can't say what

12

anyone else said" without any attempt to determine whether the statements are being used to prove the truth of the matter. This is one such case. During Harrell's direct examination, the prosecutor objected to the defendant's testifying to the conversation he heard between Leonard and Dennis, arguing it was hearsay. This conversation allegedly contained threats against Harrell, and explained why he attempted to shoot Leonard. The trial judge agreed and sustained the objection several times. I agree with the majority that the alleged threats were not offered as proof of the truth of any matter asserted, and thus were not hearsay, as the prosecution claimed and the trial court ruled.

¶22. I cannot agree, however, that Harrell was allowed to give his full version of the events in spite of the trial court's erroneous ruling. Harrell was improperly interrupted numerous times by either the prosecutor or the trial judge when trying to testify about the events, and the impact highly prejudiced his defense. On direct examination, Harrell's counsel asked him what happened when he got to work the morning at issue, but warned him, "Just tell what happened. . . . You can't say what other people said." The following is an example of the frustrating attempt of Harrell to explain what he heard Leonard and Dennis say. Harrell explained about their farm work, and stated: "We were coming back down to the combine. Mr. [Leonard] Davis pulled up beside Pete [Dennis] on the road. He stopped and told me to let the window down. They was talking." The colloquy continued:

THE COURT: Hold on one second. You are forgetting. You can't tell us what somebody else said.

THE WITNESS (Harrell): I mean -- I'm not your Honor, I mean if I don't -- if I don't say what happened -- I mean I'm not saying what they said. I am

telling you what happened.

THE COURT: I know it but you are telling us what they said.

THE WITNESS: They said -- all right. Okay. I'm sorry.

THE COURT: You can tell your side of the story but you cannot tell us what someone else said.

THE WITNESS: All right sir.

. . . .

THE COURT: Just try to remember that. I know sometimes it's hard . . . .

THE WITNESS: We -- they stopped on the side of the road. They let the window down. Leonard Davis said "Pete [Dennis] you need to talk to your worker."

THE COURT: There you go again. "Leonard Davis said."

MR. JOHNSON (Defense Counsel): Your Honor.

THE WITNESS: I don't understand.

MR. JOHNSON: Your Honor, may we approach?

THE WITNESS: Because I don't understand.

**(WHEREUPON, discussion was had between Court and counsel out of the hearing of the jury and on the record.)**

MR. JOHNSON: Your Honor, this statement is not hearsay because it does not go to the truth of the matter asserted. This is a statement that is considered to show his state of mind. This is when the statement was made.

THE DEFENDANT: That is right.

THE COURT: And he heard it.

MR. GRESHAM (Prosecutor): Exception to the hearsay rule. More than just

14

is going to the –

MR. JOHNSON:  He said it is not and he heard the threat.

. . . .

THE COURT:  He said he was trying to get around to saying -- he didn't say it.  He was telling -- he was saying something else -- that he threatened me.

MR. JOHNSON:  What -- the threat was made in his presence -- what he heard. . . . This is what Leonard said to Pete [Dennis] in his presence when he overheard the threat.

MR. WILLIAMS (Prosecutor):  He cannot refer to what he -- Leonard -- said.  He said this is what Pete [Dennis] said.

MR. JOHNSON:  No, he didn't.  No.

. . . .

THE COURT:  I will let him testify.  He can frame it in hearing what somebody said, and direct it to that, if he framed it in that manner.

MR. JOHNSON:  All right.

THE COURT:  But otherwise, it is still hearsay.

MR. GRESHAM:  It is hearsay.

MR. JOHNSON:  Your Honor, if a threat is made in your presence, I think he can testify as to what he heard, because they want to know why did you do what you did.

THE COURT:  Let him ask him if he heard a threat.

MR. GRESHAM: Your Honor, that is a leading question.  I'm going to object to that.

. . . .

MR. JOHNSON: Did anybody make a threat?

15

MR. GRESHAM: That is leading -- "threat."

MR. JOHNSON: Were any threats made?

MR. GRESHAM: That is a leading question.

THE COURT: He is right.

MR. JOHNSON: We'll withdraw the question.

**BY MR. JOHNSON:**

Q.    Did you hear any conversation between Mr. Leonard Davis and Mr. Pete [Dennis]?

A.    Yes, I did.

Q.    Did that conversation involve you?

A.    Yes, sir.

Q.    When you heard that conversation, how did that make you feel?

A.    Well I didn't even know he was talking to me. And then when he said -- when he pulled off from Pete [Dennis], he -- me and him made eye contact.

      THE COURT: You're going to have to refrain from that.

      MR. JOHNSON: Your Honor - - your Honor he - -

**BY MR. JOHNSON:**

Q.    When he made eye contact with you, what happened?

A.    He said "I'm talking to you m****r f****r." That was his word.

      THE COURT: That is sustained. You cannot testify in that manner as to what someone said.

**BY MR. JOHNSON:**

16

Q.  Did Mr. [Leonard] Davis say anything to you?

A.  That is what he said to me.

Q.  Just answer; yes or no.  Did he say anything to you?

A.  Yes, sir.

Q.  What did you do?

A.  Can I say what I said?

Q.  Yes.  Say what you said.

THE COURT:  He asked you what did you do when you heard the statement.

THE WITNESS: What did I do?

THE COURT:  What did you do?

THE WITNESS:  No.  He asked me what I said.  Ain't that is what you said?

THE COURT:  No.  He asked you what did you do.

**BY MR. JOHNSON:**

Q.  What did you do when Mr. [Leonard] Davis said something to you?

A.  I made a statement back to him.

Q.  What did you say to him?

A.  I told him "F*k you."

Q.  What did Mr. [Leonard] Davis do?

A.  Turned around and come back up there where we went on up

17

there.

Q.     What happened then?

A.     Mr. [Leonard] Davis pulled his truck at the side.  We pulled on the back.  I slid in the truck and watched Mr. [Leonard] Davis reach on his seat towards his glove compartment and start to get out the truck.  That is when I jumped off the back of the truck -- run around to the side -- opened the door and got the rifle out of there.

Q.     Why did you go get the rifle?

A.     Threatened me.

Q.     Speak into the microphone.

A.     He threatened me.

Q.     How did he threaten you?

MR. GRESHAM:  Your Honor.

**BY MR. JOHNSON:**

Q.     How did he threaten you?  What did he do?

THE COURT:  The objection is sustained.

MR. JOHNSON:  Your Honor, the question is, what did he do?

THE COURT:  All right.  What did you do when you were threatened by Mr. [Leonard] Davis?

THE WITNESS:  Mr. [Leonard] Davis said he was going to -- I mean.

**BY MR. JOHNSON:**

Q.     Let me stop you.  What did he do?  Describe his actions.

18

A.    I can't say what he said.  I'm trying to say –

Q.    What did he do?

A.    What did he do?  He -- he -- we had eye-to-eye contact.  And his statement made me say what I said.  Then he turned his truck around and came back up there.

Q.    Was he in the truck?

A.    He was getting out of his truck.  I sat on the back of the truck till I seen him open his door -- reach on the -- like he was going in the glove compartment or on his seat to get something and was -- you know -- coming to get it out of his truck.  That is when I reacted -- jumped off the truck -- went around -- opened the door and grabbed the gun.

¶23.    The majority mistakenly assumes the threat made by Leonard to Harrell was, "I'm talking to you m****r f****r."  I disagree.  The threat which the jury did not hear was made in a conversation between Leonard and Dennis, when Leonard drove up to Dennis in his pickup truck, with Harrell sitting in the bed of Dennis's truck, unbeknownst to Leonard. Leonard admitted to this fact during his direct examination.  This fact is also apparent from the following testimony of Harrell:

THE DEFENDANT:  We [Dennis and Harrell] got a pallet and two 30-gallon drums and was putting it on the back of the truck.  I got on the back of the truck – put my foot on the pallet – sitting on the tool box. . . .  Mr. [Leonard] Davis pulled up beside Pete [Dennis] on the road.  He stopped and told me to let the window down.  *They was talking.*

. . . .

THE DEFENDANT:  We – they stopped on the side of the road.  They let the window down.  Leonard Davis said "Pete [Dennis] you need to talk to your worker."

19

At this point in the colloquy the trial judge interrupted Harrell because he was stating what "Leonard Davis said." The defense attorney tried to explain that Harrell was about to testify of the threat he heard Leonard tell Dennis. After a discussion between the trial judge and both counsel, defense counsel decided to withdraw the question. Defense counsel continued questioning Harrell about the threat:

**BY MR. JOHNSON:**

Q. Did you hear any conversation between Mr. Leonard Davis and Mr. Pete [Dennis]?

A. Yes, I did.

Q. Did that conversation involve you?

A. Yes, sir.

Q. When you heard that conversation, how did that make you feel?

A. Well, I didn't even know he was talking to me. And then when he said – when he pulled off from Pete [Dennis], he – me and him made eye contact.

Harrell testified that once Leonard saw him, Leonard said: "I'm talking to you m****r f****r." However, I cannot agree with the majority's conclusion that this was the "threat" at issue. Based on the timing and the language, this phrase is not even a threat. Leonard did not even know Harrell was in the bed of the pickup truck until this point when the trucks separated, and Leonard "made eye contact" with Harrell.

¶24. The threat at issue was made when Leonard did not know Harrell was in the bed of Dennis's truck. Harrell was not allowed to testify to this threat. I acknowledge that it would

20

have been better for the defense to proffer the threat. However, I cannot say if the proffer had been made, I could have determined a substantial right of the defendant had not been affected. *See Davis v. State*, 130 So. 3d 1141, 1150 (¶32) (Miss. Ct. App. 2013) (error may not be predicated upon a ruling that excludes evidence unless a substantial right of the party is affected).

¶25. Preemptive self-defense was the crux of Harrell's defense, which relied on evidence that he had reason to retrieve the .22 caliber rifle from Dennis's truck. The Mississippi Supreme Court has reiterated that a "criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory." *Id.* (citing *Keys v. State*, 635 So. 2d 845, 848-49 (Miss.1994)). Although Harrell was ultimately able to get the words "he threatened me" out, I find that hardly gave him a fair chance to present his defense to the jury; further, it would be for a jury to decide whether the nature of the threat justified Harrell's actions. The jury did not have to believe Harrell's testimony, but it was never given the opportunity to hear it. For these reasons, I dissent.