637 So.2d 1329 (1994)
Lance L. HART,
v.
STATE of Mississippi.
No. 91-KA-00195.
Supreme Court of Mississippi.
Decided February 24, 1994.
Rehearing Denied May 26, 1994.
*1330 Jerome L. Lohrmann, Lohrmann & Associates, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
PRATHER, Presiding Justice, for the court:
Lance Hart prosecutes this appeal from his conviction of murder entered in the Circuit Court of Hinds County, First Judicial District, and the life sentence imposed.
Hart raises four issues dealing with (1) the admissibility of postmortem photographs; (2) the granting of jury instruction S-4 allegedly diluting, if not precluding, Hart's theory of self-defense; (3) the exclusion of expert opinion testimony from Dr. Stanley, a psychologist, that Hart had "reasonable grounds" to believe the victim was trying to kill him, and (4) the legal sufficiency of the evidence.

I. FACTS
On October 10, 1989, Lance Hart was indicted for murder. The indictment charged that Hart, on or about July 15, 1989, did wilfully, unlawfully, feloniously, and of his malice aforethought kill and murder George C. Thurman, III. Thurman was the estranged husband of Jennifer Thurman, a female whom Hart had befriended.

A. The State's Case
The case for the prosecution consisted of the testimony of seven (7) witnesses.
Jewel Bell, the victim's mother-in-law, testified that her daughter, Jennifer Thurman, had been separated from George Thurman since March of 1989 and was in the process of obtaining a divorce from Thurman at the time he was killed. Jennifer and her three children were living with Mrs. Bell in her mother's home on July 15, 1989. Thurman was living with his mother at 149 Holly Hill Drive in south Jackson.
At approximately 11:00 o'clock the night of July 15, 1989, Mrs. Bell received the first of four telephone calls from Lance Hart. After Hart asked to speak to Jennifer, Bell told him that Jennifer was out with a companion, David Keith.
Hart, who sounded nervous and upset, informed Mrs. Bell that George Thurman and his brother "had been harassing him and he and his family were not going ... to settle for that; that they were going to do something about it." Hart requested Thurman's address and telephone number. He hung up the telephone when Mrs. Bell declined to give out that information.
Shortly thereafter, Hart telephoned the house a second time. He told Mrs. Bell that Thurman had threatened to stomp him and break every bone in his body if he didn't stay away from Thurman's kids. According to Hart, "he wasn't going to let him get him first." The three children were with George that night because it was his visitation weekend with them. Hart told Bell that somebody needed to go over and get George and Jennifer's children out of George's house because *1331 he (Hart) was going to go and set the house on fire and burn it down.
Although Mrs. Bell provided Hart with Thurman's address, she begged Hart to stay away from the victim's house because the children were there. Hart's voice became agitated as he continued his threats and advised Mrs. Bell that he (Hart) "wasn't going to fight fair" with Thurman because he had been shot and stabbed in a California gang fight and he wasn't going to stand by and let it happen again.
During this second conversation, Hart put Bell "on hold" while he talked with another person. When he returned to her line, he said: "I'm going to have to let you go. There is a policeman on the other line talking about a gun law." According to Mrs. Bell, the tone of Hart's voice changed drastically, alarming her. "It was just a flat, level, determined ... like he had made up his mind about something... ." After Hart hung up the telephone, Mrs. Bell telephoned Jennifer and instructed her to come home so they could go and get her children.
Approximately fifteen minutes later, before Jennifer could arrive, Mrs. Bell received a third telephone call from Hart who advised her excitedly: "I did it. I killed him." When asked by Bell if he had actually killed Thurman, the defendant stated that George had fallen "like a rag doll."
When Hart hung up, a policeman called and asked for Jennifer. After Mrs. Bell told him that Jennifer had not made it home, the officer advised her that someone needed to come and get the children. Bell, accompanied by her nephew, went to Thurman's home where they picked up three frightened children. As she drove up to Thurman's house, she observed Thurman's body lying near the walkway "with his head toward the house like he'd just walked off the porch and he'd gotten shot and he just fell backwards."
Mrs. Bell described the fourth and final telephone conversation she subsequently had with Hart that evening:
He called from the police station  from jail, I assume  wanted to talk to Jennifer. Jennifer was in no shape to talk to anyone. She was like in a state of shock. So he said he just wanted to tell her he was sorry. And I said, "Sorry?" He said, "I wanted to tell her I was sorry." And I said, "George didn't deserve that." I said, "No matter what George did, he did nothing to deserve that." And he said, "I know that." But then he said, "What'd you want me to do? Wait until he come and got me?" So  and then I just hung up. That's the last conversation that I had with him." (emphasis supplied)
Ralph Lundstrom, a Jackson police officer, was dispatched to the scene to back up another unit summoned to a "shots fired" call. Lundstrom testified that when he arrived, the paramedics were present tending to a subject lying in front of the house about forty feet from the edge of the street. The victim was wearing brass knuckles on his right hand. No firearm was found on or near his body.
Lundstrom entered the house where he found three terrified children. While sitting with them in a bedroom he received a telephone call from a man who identified himself as a friend of the family and asked to speak to George. Shortly thereafter the same man telephoned a second time. After stating he had the wrong number, the man hung up the telephone. A few minutes later, the same caller telephoned a third time and asked how Mr. Thurman was. The caller then stated, "I'm the one that shot him." After Lundstrom identified himself as a police officer, Hart, in turn, identified himself to Lundstrom as Lance Hart and said he wanted to turn himself in.
Hart was arrested a short time later by Lundstrom and another officer at a location approximately two miles from the scene of the shooting. After being advised of his Miranda rights, Hart told Lundstrom he was "scared" of George; that George had threatened him; that he (Hart) had telephoned the police department and reported the incident earlier that evening; that Hart had gone over to Thurman's house and that Thurman, who was in the front yard, began to run toward Hart's car, that he shot Thurman from the car, and, finally, that the gun used in the slaying was located at Hart's home. According to Lundstrom, there was about *1332 ten feet of "running distance" between the front porch and the spot where Thurman's body was found and forty feet from the location of the body to the edge of the street.
After surrendering the gun to the officers, Hart told Lundstrom that he and George had experienced friction because of Hart's relationship with Jennifer and the two had previously argued over that relationship. Hart claimed that George had threatened to "cripple" him; that Hart had been cut up before and was "scared of this subject," and that Hart said he thought he had birdshot in the shotgun. Officer Lundstrom testified further that someone experienced with weapons and ammunition would readily be able to tell the difference between birdshot and buckshot. Finally, Lundstrom testified that Hart never mentioned having seen Thurman come out of the house with a gun, a knife, or brass knuckles.
Dr. Steven Hain (Hayne), a forensic pathologist, performed the autopsy on Thurman's body. Hain testified the cause of death was a "shotgun wound to the head." Hain further testified:
On the external examination, the decedent had been struck by multiple projectiles, a total of twelve, located predominately on the right side of the face of which two were grazed gunshot wounds, a total of six were perforating gunshot wounds; that is[,] they went into the body and exited the body, and four of which went into the body but did not leave the body. They were penetrating gunshot wounds. And it was subsequently determined by examination that this was consistent with a single discharge of a shotgun.
The type of load fired from the shotgun was consistent with buckshot. "[T]he pellets were traveling slightly upward at about five degrees."
Charles Smith, a crime scene investigator with the Jackson Police Department, testified he arrived at the scene of the homicide about ten minutes after midnight and found Thurman's body lying "about 9.8 feet north of the very front wall of the house" and about four feet from the porch. Smith observed sixteen pellet holes in the exterior of the dwelling house. The trajectory of the pellets as they passed through the wall of the house was upward from 5.8 feet to 6.8 feet from the floor. According to Smith, the shotgun was fired from a low angle, and when it was fired "it would have had to [have] been out in the street somewhere."
No physical evidence other than several spent buckshot pellets was recovered from the scene of the shooting. The shotgun was recovered from the home of Hart while the brass knuckles were recovered from the morgue. In Smith's opinion, Thurman was lying at the spot where he was shot, and the shotgun pellets were consistent with ammunition and trajectories that would be emitted from a 20 gauge shotgun such as the one recovered from Hart's home.
Danny Woods, a lieutenant with the Jackson Police Department, testified he spoke to Hart over the telephone at approximately 11:30 on the night of the shooting. Hart informed Woods that his life had been threatened by a man named George Thurman and that Thurman had accused Hart of breaking up his marriage. Hart wanted to know what he could do about it. Woods advised Hart to obtain a peace bond against the subject from a justice court judge. Hart then asked what he should do if George Thurman came to his house. Woods told Hart to telephone 911 and get the police over there. Finally, Hart asked questions about the concealed weapon laws of Mississippi. He wanted to know how he could carry a gun legally. Woods cut him off by advising him to "[d]on't even be involved in firearms." Woods understood from Hart that Hart was afraid of George Thurman.
David Fondren, a Jackson police officer assigned to the robbery-homicide division, testified he and Detective Knowles interviewed Hart the morning after Hart's arrest.
He told us that he had received several telephone calls
that night from George Thurman threatening his life. Told him that he was gonna get him. He told him that he knew what he looked like. He told him he's been following him. He told him some of his activities that  that he had carried on during the past few weeks and he just made *1333 threats to him and telling him he was gonna get him.
....
In one of their telephone conversations, George Thurman told him to come down to the house and he would beat him up. He stated that, "How am I gonna know which house it is?" He said, "Well, if you'll ride up and down the street, the porch light will be on and blow the horn and I'll come out."
Hart told Fondren he armed himself with a 20 gauge shotgun and drove to Thurman's house because "he wanted to get this over with." "He wanted to resolve this issue one way or another. He wasn't gonna live like this. He wasn't gonna  just wasn't gonna put up with it."
Fondren continued:
[Hart] stated that he went up and down the street a couple of times and then he went down to a  I believe it's a cul-de-sac, if I'm not mistaken, and he turned around at the end of the street and he sat down there. And then he said that he saw George Thurman come out of the house and he drove up to where he was and stopped in the middle of the street.
....
[H]e pulled up to where George Thurman was coming from the house to the outside. He said that George Thurman had his hand behind his back. He said he didn't know what he had behind his back.
Hart did not say anything about observing a weapon; he only saw Thurman's hand behind his back. When Thurman started toward him, Hart raised his shotgun and fired one time at Thurman's feet. Hart told the officers he was sitting in his car when he shot George Thurman with the shotgun.
Charles Stringer, an ear and eyewitness to the shooting, was living directly across the street from George Thurman. Around midnight on the evening of the shooting, Stringer heard the honking of an automobile horn. Upon looking out a window, he saw a car "driving slowly in front of Mr. Thurman's house and he stopped, pulled in and drove back again in front of it and honked his horn again." When the car was twenty-five yards down the street, "Thurman come out of his house and walked to the street to see who was beeping at his house." When Thurman began walking back to his house the driver of the car "put his brakes on suddenly and turned around and started heading back toward the house as George was walking toward the house." Thurman was about a foot in front of his own sidewalk and fifteen feet from his front door when he turned around to face the car and stood there. Stringer testified he thought Thurman was trying to figure out who was inside the car but he "could plainly see [Thurman's] hands were beside him."
While Thurman was standing still and facing the passenger side of the car with his hands at his side, the shotgun went off one time. Thurman went down sideways at the spot where he had been standing. Stringer never observed a weapon of any kind in Thurman's hands and never saw Thurman advancing toward Hart's automobile.

B. The Defendant's Case
Lance Hart, twenty-eight (28) years of age, testified at great length in his own behalf and produced Charlton Stanley, a psychologist, as an expert witness.
Hart testified that while he was serving in the Navy from 1979 to 1983, another man cut and stabbed him with a knife. This incident made Hart "scared of people" and afraid of fights.
Jennifer Thurman had been his classmate in junior high school at Forest Hill. When Hart returned to Jackson, he became reacquainted with her, and she discussed her marital problems with him.
Around 11:00 p.m. the night of July 14th, Hart received a telephone call at his house from a person he suspected was either George Thurman or George's brother. The caller threatened to kill Hart and stated that "he knew every move" Hart made. According to Hart, this conversation "terrified" him.
After the caller hung up, Hart telephoned Jennifer but spoke with her mother, Mrs. Bell. The purpose of the call was to tell Jennifer what happened and to find out what kind of person he was "dealing with." Hart *1334 did not recall telling Mrs. Bell that he was going to burn George's house down, however, he acknowledged he was "so scared" he could have said anything.
Upon terminating that conversation, Hart called 911. When Officer Woods returned Hart's call, Woods advised Hart that if he had to carry a gun, to "leave it out in the open so people could see it." Woods also told Hart the police could not rectify matters until Thurman actually "did something."
Hart testified he was in a panic after receiving no help from either Mrs. Bell or the girlfriend of George Thurman's brother. Shortly thereafter, Thurman telephoned Hart again and informed him that he was "dead meat." Additionally, he told Hart, "[Y]ou know where I am tonight, but you won't know where I am tomorrow." Thurman added that if Hart "wanted to do anything or get a look at him I'd have to do it tonight 'cause after tonight, I wouldn't be able to do nothing and I'd be  I'd be his."
According to Hart, the following conversation then took place:
Well, then he said, "You come over here." He said, "The kids are in the back room in the bed." Said, "Don't worry about them." He give [sic] me instructions how to get to the house. Come down Mayfair Road, turn down Holly Hill Drive and it'd be the house with the '60 model blue truck in it and I'll have all the lights on. He had the front light on. Honk the horn when I drove by.
Prior to leaving, he armed himself with a 20 gauge shotgun loaded with buckshot after deciding against taking a .357 handgun or a 30-30 rifle. Hart claimed he intended to use birdshot which shoots a wider pattern and which would "have made him [Thurman] drop his weapon and take cover, give me enough time to get away from danger."
After driving to Holly Hill Drive, Hart drove up and down the road honking his automobile horn. He passed Thurman's house three times. Finally, he observed a man in the light. According to Hart, Thurman "made about two steps on the sidewalk and one step into the grass and he proceeded to draw a weapon with his right hand." Hart testified that Thurman "was fixing to pull out a pistol and shoot me." The defendant grabbed his shotgun that had been lying on the seat of the car and fired. Hart insisted that Thurman's hand was in motion for a distance of four or five inches when Hart pulled the trigger. Hart was not aware at the time he fired that Thurman was wearing brass knuckles.
Hart claimed he went over to Thurman's house because Thurman had said over the telephone this would be Hart's only chance to settle this thing. After shooting Thurman, Hart drove away at a high rate of speed, removed the spent hull from the shotgun and tossed it out the window of his automobile. The hull was recovered by the authorities on the side of Terry Road.
During cross-examination, Hart freely admitted that no one forced him to load a shotgun and take it to Thurman's house. The defendant also acknowledged he was not expecting Thurman to come to his house that night.
Hart, in the final analysis, claims he shot Thurman in self-defense.
Dr. Charlton Stanley, a clinical psychologist who first examined Hart on July 27, 1989, testified that Hart was suffering from an anxiety disorder known as "post-traumatic stress" syndrome. According to Stanley, Hart had an exaggerated "startle response."

II. DISCUSSION
Four issues are presented for appellate review.

A. Inflammatory Postmortem Photographs
Hart claims he is entitled to reversal and a new trial as a result of the allegedly erroneous admission into evidence of the prosecution's Exhibits 7 and 8, two 3 1/2" X 5" color photographs of the decedent taken during the postmortem examination conducted by Dr. Hain (Hayne). It is Hart's position that both photographs were irrelevant, as well as gruesome, and that they served only to evoke bias, passion and prejudice on the part of the jury against the defendant.
*1335 The State of Mississippi, on the other hand, contends that both photographs had probative value and served a meaningful or useful evidentiary purpose in clarifying the testimony of Dr. Hain, the State's pathologist. This Court agrees with the State.
Exhibit 7, a frontal view of the victim's face, depicts the location of the pellet wounds causing Thurman's demise. Exhibit 8, a view of the right side of the victim's head and face, depicts several of these pellet wounds, three of which have been pierced by autopsy tools. Both photographs were taken after the body had been embalmed but prior to Dr. Hain's autopsy. Consequently, very little blood is portrayed in the photographs.
This Court recently addressed the ground rules concerning the admissibility of autopsy photographs in Noe v. State, 616 So.2d 298, 303 (Miss. 1993), where three color postmortem photographs were the targets of similar arguments. One of the three photographs depicted an endotracheal tube protruding from the victim's mouth. In holding the photographs had probative value and were admissible to show the size, nature, and location of the gunshot wounds described by the coroner, this Court stated:
The photographs introduced here were neither inordinately gruesome nor inflammatory. They served a meaningful evidentiary purpose in establishing the identity of the man shot by Noe and also the size, nature, and location of the gunshot wounds described by coroner Martin. More importantly, the photographs corroborated the testimony of Evette Wells that at the time Wilson was shot he was lying on the ground defenseless, reaching up with his hand in a conciliatory gesture while seeking to return the package of cocaine he had taken from Noe. The probative value of the three photographs outweighed any prejudicial effect they were likely to engender. See Berry v. State, 575 So.2d 1 (Miss. 1990).
It is well settled in this state that the admission of photographs is a matter left to the sound discretion of the trial judge and that his decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion. Gardner v. State, 573 So.2d 716 (Miss. 1990); Sudduth v. State, 562 So.2d 67 (Miss. 1990). "A review of our case law indicates that the discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." [emphasis supplied] Williams v. State, 544 So.2d 782, 785 (Miss. 1987). A photograph, even if gruesome, grisly, unpleasant, or even inflammatory, may still be admissible if it has probative value and its introduction into evidence serves a meaningful evidentiary purpose. Sudduth v. State, 562 So.2d 67, 69 (Miss. 1990); Lanier v. State, 533 So.2d 473, 484 (Miss. 1988); Koch v. State, 506 So.2d 269, 271 (Miss. 1987); Cardwell v. State, 461 So.2d 754, 760 (Miss. 1984).
However, while a trial judge has a great deal of discretion in the admission of photographs, this discretion is not unfettered. Indiscriminate use of autopsy photographs depicting a corpse upon which a medical technician or pathologist has used the tools of his trade to puncture, sever, dissect, and otherwise traumatize body parts is ill-advised. Autopsy photographs are admissible only if they possess probative value. McNeal v. State, 551 So.2d 151, 159 (Miss. 1989).
Id. 616 So.2d at 303.
According to Dr. Hain, Exhibits 7 and 8 were taken "to clarify and document photographically the injuries sustained by the decedent in the course of his death." Prior to offering the two photographs as full evidentiary exhibits, the prosecution elicited testimony from Dr. Hain establishing (1) both photographs were accurate with respect to showing the location of the wounds Hain had described for the jury, (2) the photographs would assist him in explaining the placement of the entrance and exit wounds as well as the location of the wounds and the trajectory of the projectiles, (3) it would be difficult to explain the location of twelve pellet wounds without photographic evidence, and (4) exhibit 8 clearly shows the upward trajectory and the slight right to left angulation of the pellets.
*1336 The defense objected to admissibility on the ground that any probative value was outweighed by prejudicial effect. The trial judge overruled the objection after stating that he did not "see that the photographs are that gruesome and ... they clearly show, as the doctor stated, the angle of the projectiles."
Dr. Hain thereafter used exhibit 8 in describing the five degree upward trajectory of the offending projectiles as well as the precise location of the entrance wounds anteriorly and the exit wounds posteriorly. He used exhibit 7 to describe the slight right to left angulation of the pellets as well as to demonstrate the location of additional gunshot wounds that exhibit 8 did not.
The upward trajectory of the shotgun pellets was significant because Hart told Officer Fondren the following day he shot at Thurman's feet. During closing argument, the assistant district attorney stated "that those buckshot pellets went through George Thurman's head, face and neck at an upward angle. You can see this from the autopsy photographs." (emphasis supplied)
There is no doubt the photographs met the requirement of "relevant evidence" as that term is defined by Rule 401 of Mississippi Rules of Evidence. In short, they had probative value to show the location, angulation, and trajectory of the gunshot wounds.
Rule 403 of Mississippi Rules of Evidence states, however, that relevant evidence may be excluded if its probative value is substantially outweighed by its tendency to mislead, confuse, or prejudice the jury. "This rule necessarily vests in the Circuit Court a certain amount of discretion." Stokes v. State, 548 So.2d 118, 125 (Miss. 1989) (no abuse of judicial discretion in admitting into evidence grisly autopsy photographs of victim's face and neck.)
No abuse of judicial discretion has been demonstrated in the case sub judice where a forensic pathologist used the photographs to explain the location, trajectory, and angulation of multiple entrance and exit wounds. See Turner v. State, 573 So.2d 657, 667 (Miss. 1990) (no abuse of judicial discretion in admitting photographs used by forensic pathologist to point out wounds and effects of wounds); Lanier v. State, 533 So.2d 473, 484 (Miss. 1988) (autopsy photographs depicting fatal gunshot wound to the head were properly "used in conjunction with the testimony of the physician who did the autopsy"). The probative value of the two photographs was not outweighed by any prejudicial effect.

B. Instruction S-4
Hart complains about the granting of jury instruction S-4 which reads as follows:
The Court instructs the Jury that if you believe from the evidence in this case beyond a reasonable doubt that the Defendant, LANCE HART, armed himself with a deadly weapon and sought GEORGE THURMAN, with the formed felonious intention of invoking a difficulty with GEORGE THURMAN, or brought on, or voluntarily entered into any difficulty with GEORGE THURMAN with the designed and felonious intent to cause serious bodily harm to GEORGE THURMAN, then the Defendant, LANCE HART, cannot invoke the law of self-defense, no matter how imminent the peril in which LANCE HART found himself.
On appeal Hart claims that S-4 was improper because it allowed the jury to entirely discount the defendant's theory of self-defense. Hart also argues that portions of S-4 lacked evidentiary support.
The record clearly reflects that the only target of Hart's objection to S-4 in the lower court was that portion of the instruction which reads, "or voluntarily entered into." Hart stated in plain and ordinary English that, "I have no objection to the rest of the instruction." Also, Hart's argument on appeal is diluted by the fact that he did receive a self-defense jury instruction.
Thus, the only viable challenge to S-4 on appeal is whether or not the words, "or voluntarily entered into" were supported by the evidence. The complete answer to this contention is Hart's acknowledgement during cross-examination that no one forced him to load the shotgun or drive over to Thurman's house the night of the fatal shooting. Hart's objection to S-4 is without merit.
*1337 It is a rare case indeed where an instruction cutting off one's right to self-defense is supported by the evidence. The S-4 charge precluded the jury from considering a claim of self-defense, no matter how imminent the peril, in the event the jury found the existence of certain facts. The purpose of S-4 was to inform the fact-finder that one cannot arm himself in advance when he is not in any physical danger, go forth and provoke a confrontation or difficulty with another, shoot the other, and then attempt to hide behind a smoke screen of self-defense.
This Court approved this instruction in Hall v. State, 420 So.2d 1381 (Miss. 1982) and Reid v. State, 301 So.2d 561 (Miss. 1974), two cases involving aggravated assault and murder, respectively, because the instruction fit the facts. The facts in the instant case are similar to those found in Reid. In contrast to these cases, this instruction was not allowed in Williams v. State, 482 So.2d 1136 (Miss. 1986); however, the factual scenario in Williams is clearly distinguishable from that in the case at bar. In Williams, while the defendant did enter the victim's house armed, he did not shoot the victim until after a physical confrontation between the two and after the victim attempted unsuccessfully to shoot the defendant. Williams, 482 So.2d at 1139. Based on these facts, the Court concluded that this type of instruction was not proper. Id. Also, this instruction was not allowed in Barnes v. State, 457 So.2d 1347, 1349-50 (Miss. 1984). However, in Barnes, unlike the case at bar, there was a considerable amount of dispute as to which person, the defendant or the victim, was the aggressor at the time of the shooting. Barnes, 457 So.2d at 1348.
In Barnett v. State, 563 So.2d 1377, 1381 (Miss. 1990), a third decision dealing with the same instruction, this Court was not persuaded under the facts of that case that the granting of the instruction amounted to error, and certainly not reversible error. This Court held:
In this case the testimony was that Barnett, when in no physical danger, went into both trailers and after fully arming himself, went back out, and in a matter of seconds, at most, shot and killed Harmon. We do not retreat from what we have repeatedly stated, that only in cases where the proof substantiates the accused was not in any danger when he armed himself, and from which the proof will show that he armed himself for the very purpose of shooting the victim, that such an instruction may be properly considered by the court.
The uncontradicted facts in the case at bar favor the State in a much stronger way than the facts found in Barnett. Here the only evidence of self-defense is Hart's testimony that Thurman, while 40 feet away and with his hands at his side, made a slight rearward motion with his right hand which Hart, interpreted as an attempt by Thurman to obtain a weapon. Even if this is true, Hart cannot claim self-defense where, as here, the proof is uncontradicted that, while in no physical danger from Thurman, he armed himself in advance with the intent of provoking or bringing on a difficulty and shooting Thurman, if necessary, during the course of the confrontation. Prine v. State, 73 Miss. 838, 19 So. 711 (1896).
When Hart's own testimony is considered in the light most favorable to him, it demonstrates that he, while in no physical danger from his adversary, armed himself with a 20 gauge shotgun after carefully deliberating over his choice of firearms. No one forced him to load the shotgun and take it to Thurman's house where he honked his automobile horn and drove by several times waiting for Thurman to appear. Although Hart claimed that he shot at the feet of Thurman, the physical facts demonstrate the trajectory was upward.
There is no evidence in this case that Hart, after arming himself in advance and driving to Thurman's home, later changed his mind, abandoned his original purpose and intent, and attempted in good faith to withdraw from the encounter. To the contrary, Hart was the aggressor from start to finish.
Although the S-4 charge and instructions similar to it have been strongly criticized in a long line of Mississippi cases, see Williams v. State, 482 So.2d 1136, 1139 (Miss. 1986), this is one of those extremely rare cases where the instruction was supported by the evidence, *1338 including the defendant's own testimony. Nevertheless, a caveat is clearly in order. This instruction and others like it are fraught with danger. See Hall v. State, 420 So.2d at 1386 (Hawkins, J. dissenting). When the State seeks this instruction, it does so at its own peril.

C. Dr. Stanley's Opinion
Dr. Charlton Stanley, a clinical psychologist engaged in private practice, testified he first examined Hart on July 27, 1989, approximately two weeks following the shooting. Hart told Stanley, inter alia, that he had been seeing a fellow's ex-wife and that he had received telephone calls from this man who had threatened to kill him.
Dr. Stanley defined Hart's condition as "post-traumatic stress" syndrome, an anxiety disorder which, in Hart's case, was largely a product of a prior stabbing incident in California. According to Stanley, this disorder is characterized by, inter alia, "persistent avoidance behavior" which consists of "[t]rying to avoid anything that will remind you of the [past] event."
Hart contends the trial court erred when it excluded from the jury's consideration expert opinion testimony from Dr. Stanley that Hart had "reasonable grounds" to believe that Thurman was trying to kill him. The lower court, in effect, excluded opinion testimony from Stanley that Hart acted justifiably in self-defense.
This Court finds no error in the lower court's ruling. A trial judge may exclude expert opinions which are not helpful to the trier of fact and which state legal conclusions beyond the specialized knowledge of the expert. Whether or not Hart, under the circumstances, had reasonable grounds to believe that Thurman was going to kill him, was a matter to be decided by the fact-finder alone.
The questions and answers specifically objected to outside the hearing and presence of the jury are quoted as follows:
Q. Do you have an opinion as to whether or not [Hart] had reasonable grounds to apprehend that Thurman would kill him under those circumstances?

A. Thurman had told him he was going to kill him. Mrs. Thurman, who Lance had been dating, had told him basically that Thurman did everything he said he was going to do and he took it seriously. He was afraid of Thurman. The only reason he went over there was he didn't know what he  what Thurman looked like. (emphasis supplied)
....
Q. Do you have an opinion as to whether or not in Lance's mind he had reasonable grounds to believe that Thurman was trying to kill him?

A. Yes, sir, I have  I have reason to believe that Lance believed that.
Q. And why is that?
A. Because Thurman told Lance he was gonna kill him. And Lance believed that. (emphasis supplied)
In sustaining the State's objections to these inquiries, the trial judge opined:
He's not going to get into question[s] of law and quit using law terms and ask him a question on psychology.
....
[T]he question of whether it's reasonable or not is for the Jury to decide. The doctor can give his opinion as to what the man's state of mind was and why, but he's not going to be allowed to state that [the defendant] acted in self-defense and that's what  you say he acted on reasonable grounds is what you're saying. (emphasis supplied)
Hart assails these exclusions by pointing out that the former "ultimate issue" rule has been abolished in this state by M.R.E. Rule 704, which reads as follows:
Rule 704. Opinion on Ultimate Issue
Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
As stated in the "Comment" to Rule 704, however, the abolition of the ultimate issue rule does not result in the admission of all *1339 opinions. It is an absolute requirement under Rules 701 and 702 that opinions must be helpful to a determination of the case before they are admissible.
In May v. State, 524 So.2d 957, 964 (Miss. 1988), we stated:
Every expert opinion embracing the ultimate fact is not per se admissible, however. The opinion still must be helpful to the trier of fact. "Questions which simply allow the witness to tell the jury what result to reach are impermissible, as are questions asking the witness for a legal conclusion." "[T]he task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one."
....

[A]n opinion which covers facts within the common knowledge or experience of lay people will not be helpful and therefore [is] inadmissible. (citations omitted) (emphasis supplied)
Id.
In order to justify killing another in self-defense, the actor's apprehension of danger must be "objectively" reasonable. Cook v. State, 467 So.2d 203, 207 (Miss. 1985). That is to say, the apprehension of danger that would justify a killing of another on the ground of self-defense must be real and such as would or should, under the circumstances, be entertained by a reasonably well-disposed man of average prudence. Whether the accused has in a particular case, measured up to that standard of conduct is a question to be submitted to, and decided by, the jury. Rush v. State, 278 So.2d 456, 459 (Miss. 1973).
Thus, whether a defendant has "reasonable grounds" to fear imminent death or serious bodily injury is governed by an objective criterion. The defendant is judged not according to his own particular mental frailties but by a "reasonable person" standard. Buchanan v. State, 567 So.2d 194, 198 (Miss. 1990) ("Regardless of how bona fide (in good faith) the belief of appellant was as to danger of great bodily harm ... the test is whether or not a reasonable person under the same or similar circumstances would have considered herself to be in such danger and would have thought there was reasonable cause to kill ... for her own protection.") See also Taylor v. State, 452 So.2d 441, 449 (Miss. 1984) ("reasonable person" standard presupposes an individual without serious mental and emotional defects.)
Accordingly, Hart's own peculiar frailties would not have been helpful to the fact-finder where, as here, the killing was either murder or justifiable by self-defense. No manslaughter instruction was requested.
In State v. Flick, 425 A.2d 167, 170 (Me. 1981), the defendant wanted to ask a psychiatrist and a clinical psychologist to state their opinions "as to whether Flick acted intentionally or knowingly at the time of the killing, or acted in extreme anger or fear." Id. at 170. The trial judge would not permit this question, saying:
Your experts are not legal experts... . They may testify concerning their medical and psychological evaluation of Mr. Flick, whether he suffered from some abnormality ... how that abnormality manifests itself in terms of effect on his mental processes. The jury will then draw the conclusion as to whether he acted knowingly or intentionally.
The trial judge issued a similar ruling in the case at bar. In the Flick case, the defendant argued on appeal the trial court's ruling was repugnant to Rule 704 which abolished the ultimate issue rule. The Supreme Judicial Court of Maine stated:
In criminal cases, courts have frequently held that medical and psychiatric witnesses must not frame their testimony in terms of the legal conclusions to be drawn by the fact finder.
....
Under M.R.Evid. 701 and 702, the presiding justice may exclude opinions which state legal conclusions, beyond the specialized knowledge of the expert. He may also exclude opinions which are arguably within the expert's specialized knowledge, but which are so conclusory, or so framed in terms of the legal conclusions to be drawn, that they will not "assist the trier of fact" (M.R.Evid. 702), or will pose a danger of confusing the jury which outweighs *1340 their probative value (M.R.Evid. 403), or if there is an insufficient factual basis to support the conclusions (M.R.Evid. 705(b)).
Id. at 170-71. Cf. Roe v. State, 95 Wis.2d 226, 290 N.W.2d 291, 302 (1980) (the Supreme Court of Wisconsin noted that psychiatrists are not legal experts, they are medical experts who are not competent to give an opinion as to the guilt or innocence of the defendant as to any particular degree of murder or manslaughter.)
Significantly, the federal counterpart to M.R.E. 704, formerly identical to our present rule, was amended in 1984 to read as follows:
(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone. (emphasis supplied)
Finally, the question posed to Dr. Stanley was inappropriate because it covered only half of the equation. A defendant must not only have reasonable grounds to apprehend a design on the part of the victim to kill him or to do some great bodily harm, he must also have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. Robinson v. State, 434 So.2d 206, 207 (Miss. 1983).
In the final analysis, Dr. Stanley's opinion would not have been helpful to a jury, and the trial court acted correctly in prohibiting Stanley from issuing legal conclusions with respect to the defendant's state of mind.

D. The Sufficiency of the Evidence
Hart argues that the uncontradicted facts demonstrate he was acting out of sheer terror and self-defense when the fatal shot was fired. If not, says Hart, the testimony at least creates a draw on the issue of legal sufficiency, and a tie goes to the defendant. The issue is whether the evidence is sufficient or it is not; there can be no tie.
In judging the sufficiency of the evidence on a motion for a directed verdict or request for peremptory instruction, the trial judge is required to accept as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn therefrom, and to disregard evidence favorable to the defendant. Clemons v. State, 460 So.2d 835 (Miss. 1984); Forbes v. State, 437 So.2d 59 (Miss. 1983); Bullock v. State, 391 So.2d 601 (Miss. 1980). If, under this standard, sufficient evidence to support the jury's verdict of guilty exists, the motion for a directed verdict and request for peremptory instruction should be overruled. Brown v. State, 556 So.2d 338 (Miss. 1990); Davis v. State, 530 So.2d 694 (Miss. 1988).
The motion for judgment of acquittal notwithstanding the verdict also tests the legal sufficiency of the evidence supporting the verdict of guilty. It is in effect a renewal of the defendant's request for a peremptory instruction made at the close of all the evidence. May v. State, 460 So.2d 778, 780 (Miss. 1984). "[T]he same principle of law applies to it as applies to the motion for directed verdict and request for peremptory instruction." State v. Russell, 358 So.2d 409, 413 (1978).
With respect to the defendant's post-verdict j.n.o.v. motion, our familiar rule "is that the trial judge  and this Court on appeal, as well  must consider all the evidence  not just the evidence which supports the prosecution's case  in the light most favorable to the prosecution." Bunkley v. State, 495 So.2d 1, 3 (Miss. 1986).
Our stringent standard of appellate review was rearticulated in Garrett v. State, 549 So.2d 1325, 1331 (Miss. 1989) (quoting McFee v. State, 511 So.2d 130, 133-34 (Miss. 1987)), where we stated:
When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. *1341 We proceed by considering all of the evidence  not just that supporting the case for the prosecution  in the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict is thus placed beyond our authority to disturb. (emphasis supplied)
Id. 549 So.2d at 1331.
Hart, by targeting the sufficiency of the evidence, seeks reversal and discharge. This Court is not at liberty to direct that the defendant be discharged "short of a conclusion on our part that given the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty." May v. State, 460 So.2d at 778, 781. Hart, of course, testified in his own behalf and claimed he shot Thurman justifiably in self-defense. In this case, reasonable and fairminded jurors in the exercise of impartial judgment could have reached different conclusions.
The evidence favorable to the State's theory of the case demonstrates that Hart, after threatening to do something to Thurman before Thurman did something to him and after threatening to burn the decedent's house on the night of the shooting prior thereto, armed himself with a shotgun that he loaded with buckshot. Hart drove to the victim's home intending to provoke a difficulty and to use the gun, if necessary, to overcome his adversary during the confrontation. Hart made his presence known by honking his horn, and he thereafter shot Thurman from a distance of 30-40 feet at a time when the victim's hands were at his side. Although Thurman was wearing brass knuckles on his right hand when he was shot, this fact is inconsequential within the context of the defendant's version of self-defense because brass knuckles would not inspire a reasonable fear of imminent bodily harm from a distance of 30-40 feet. More importantly, Hart testified he was not aware Thurman was even wearing brass knuckles at the time he shot Thurman.
Following the shooting, Hart gave statements to the police which conflicted with his testimony elicited during trial.
There is a great deal of testimony in the record that Hart shot Thurman because Hart was scared or afraid of Thurman and what Thurman might do to him in the future. This Court has stated, however, that "one does not have the right to kill another merely because he is afraid of him; nor may one kill another because he is afraid that he will receive some bodily harm." Shinall v. State, 199 So.2d 251, 259 (Miss. 1967). Both Hart and Dr. Stanley testified that the only reason Hart drove over to Thurman's house was to see what Thurman looked like. Needless to say, this testimony is patently inconsistent with Hart's testimony that he was deathly afraid of Thurman.
It is enough to say the proof created a factual issue with respect to whether the killing, which was admitted, was either murder or justifiable homicide. See Harris v. State, 532 So.2d 602, 603-05 (Miss. 1988); Griffin v. State, 495 So.2d 1352, 1354 (Miss. 1986).
Accepting, as we must, the testimony of the State's witnesses as true and considering, again as we must, all the evidence in the light most favorable to the prosecution's theory of the case, we have little difficulty concluding there is sufficient evidence in the record from which a jury could find beyond a reasonable doubt the killing of Thurman was malicious and was not done in necessary self-defense.

CONCLUSION
The trial court did not abuse its judicial discretion in admitting into evidence two color autopsy photographs of the victim because *1342 they had probative value; Hart's challenge to jury instruction S-4 is devoid of merit because S-4 had evidentiary support; the court did not abuse its judicial discretion in excluding portions of Dr. Stanley's testimony which attempted to state an incomplete legal conclusion, and the evidence was legally sufficient to support the verdict of the jury.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
HAWKINS, C.J., and PITTMAN, BANKS, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J., and SULLIVAN, J.
McRAE, Justice, dissenting:
Instruction S-4, as granted, is analogous to and indistinguishable from a peremptory instruction for the State. As this Court has on many occasions denounced such affirmative self-defense instructions and ordered reversal for such use, this type of instruction should be abolished. For almost a century this Court has stated its distaste for this type of instruction. Such an instruction primarily singles out certain parts of the evidence for consideration and requires a jury to omit other parts favorable to the accused. It is for this reason that I dissent.
An instruction such as Instruction S-4 places a higher burden on a defendant to plead self-defense and, in effect, closes the door to any self-defense argument a defendant might have. Instruction S-4 precludes a jury from considering a self-defense instruction if it finds that the defendant first voluntarily armed himself with the felonious intent of invoking a difficulty with another. The majority holds that Hart's appeal is diluted because he received a self-defense instruction. This is of no value or significance since Instruction S-4 never allows the jury to consider the self-defense instruction if a defendant voluntarily arms himself and brings on difficulty. Not all wrongful acts which provoke a deadly encounter justify depriving one of self defense.
In Lucas v. State, 109 Miss. 82, 90, 67 So. 851, 852 (1915), this Court enunciated:
It is not every act of aggression or provocation which produces a difficulty, and in the course of which a necessity to kill another arises, that will preclude the slayer from availing himself of the right of self-defense; but it depends upon the character and quality of the act, and in some jurisdictions also upon the intent with which the difficulty was brought on.
The fact that Hart carried a weapon has no impact upon whether he should be denied a claim of self-defense since in Stennis v. State, 234 So.2d 611, 614 (Miss. 1970), this Court stated the following:
Furthermore, we have held that a person may not use more force that reasonably appears necessary to save his life or protect himself from great bodily harm; that where a person repels an assault with a deadly weapon, he acts at his own peril and the question of whether he was justified in using the weapon is for determination by a jury unless there is no reasonable inference in the evidence except that the use of the deadly weapon appeared necessary to protect the person from death or great bodily harm at the hands of his assailant. (Emphasis added.)
This instruction causes the jury to step into the shoes of a judge as it directs a jury to determine if a self-defense instruction should be considered. It is a trial court's duty to insure that both parties are afforded their theories and defenses. In Hester v. State, 602 So.2d 869, 872-72 (Miss. 1992), this Court stated:
In a homicide case, as in other criminal cases, the court should instruct the jury as to theories and grounds of defense, justification, or excuse supported by the evidence, and a failure to do so is error requiring reversal of a judgment of conviction. (Citations omitted). Even though based on meager evidence and highly unlikely, a defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination *1343 by the jury under proper instruction of the court. (Emphasis added.)
The jury is given that duty rather than performing its duty of reading all instructions together and considering them as a comprehensive whole. Rayburn v. State, 312 So.2d 454, 456 (Miss. 1975). A jury is not empaneled to determine what law or jury instructions it will consider, and Instruction S-4 does just that. In Prine v. State, 73 Miss. 838, 19 So. 711 (1896), a similar jury instruction was granted. This Court began its distaste for such instructions when it held:
The fourth instruction is unfair to the prisoner, in that it singles out certain parts of the evidence for prominent presentation to the jury, and omits other parts favorable to the accused.
Prine, 73 Miss. 838, 19 So. at 712. By the court granting Instruction S-4, Hart was denied a fair trial under both our state and federal constitutions.
The majority holds that "there is no evidence ... that Hart, after arming himself in advance and driving to Thurman's home, later changed his mind, abandoned his original purpose and intent, and attempted in good faith to withdraw from the encounter." To the contrary, evidence exists in the record, over no objection, that could support a self-defense claim.
There is undisputed and corroborating testimony that Hart called the emergency number for the Jackson Police Department on the night of the shooting requesting assistance as his life had been threatened. Hart testified that he had received a telephone call earlier that night from Thurman, who revealed that he had been stalking Hart. After Hart talked with the Jackson Police Department, he received a second telephone call from Thurman who again threatened his life. Hart testified that Thurman asked Hart over to his house to settle the dispute, instructed Hart as to his location and told Hart to honk his horn when he arrived. After Hart arrived, Thurman came out the door. Hart testified that as Thurman advanced toward Hart's car, he proceeded to draw a weapon with his right hand. Although no gun was found on Thurman, Hart demonstrated to the trial court Thurman's bodily movements which suggested that Thurman could have possibly been reaching for a weapon[1]. Hart testified:
Q. All right. And what was going through your mind the moment that his hands came from being down here to one headed backward?
A. He was fixing to pull out a pistol and shoot me.
Q. Did you think rationally through what was going on or did you just reach for that shotgun and bring it up?
A. Well, I moved all in one reaction. When he proceeded to go for a weapon, when he moved his right hand toward his back, I had to react or be killed. And I react in  instantly.
The majority concedes that Instruction S-4 is fraught with danger. There exists no other circumstance in which this Court denies a defendant the right to assert the claim of self-defense. For almost a century this type of instruction has repeatedly and painstakingly been criticized. See Thompson v. State, 602 So.2d 1185 (Miss. 1992); Williams v. State, 482 So.2d 1136 (Miss. 1986); Barnes v. State, 457 So.2d 1347 (Miss. 1984); McMullen v. State, 291 So.2d 537 (Miss. 1974); Patrick v. State, 285 So.2d 165 (Miss. 1973); Craft v. State, 271 So.2d 735 (Miss. 1973); Ellis v. State, 208 So.2d 49 (Miss. 1968); Tate v. State, 192 So.2d 923 (Miss. 1966). See also Thompson v. State, 190 Miss. 639, 200 So. 715 (1941); Brown v. State, 186 Miss. 734, 191 So. 818 (1939); Vance v. State, 182 Miss. 840, 183 So. 280 (1938); Coleman v. State, 179 Miss. 661, 176 So. 714 (1937); Lee v. State, 138 Miss. 474, 103 So. 233 (1925); Adams v. State, 136 Miss. 298, 101 So. 437 (1924); Garner v. State, 93 Miss. 843, 47 So. 500 (1908); Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903); Lofton v. State, 79 Miss. 723, 31 So. 420 (1902); and Prine v. State, 73 Miss. 838, 19 So. 711 (1896).
*1344 The majority notes that this Court has approved this instruction in two cases and suggests that the facts in the case sub judice are similar to one of the two cases, Reid v. State, 301 So.2d 561 (Miss. 1974). Reid, however, can easily be distinguished. In Reid, an eyewitness to a murder testified that the defendant entered the victim's trailer and shot the victim while the victim remained seated in a chair. Reid, 301 So.2d at 562. In the case sub judice, Thurman advanced toward Hart causing Hart to fear for his life. In no way can that be similar to Reid since the victim in Reid made no attempt to get up out of his chair.
We should do no less than to hold that such an instruction should never be used and, if ever used, reversal mandated. Accordingly, I dissent.
DAN M. LEE, P.J., and SULLIVAN, J., join this opinion.
NOTES
[1] It should be noted that both armed themselves to meet each other as Thurman was found with brass knuckles. Obviously, Thurman intended to harm Hart by carrying the brass knuckles. Hart was not aware of the brass knuckles but thought Thurman had a gun instead.