BRIDGES, J.,
for the Court:
¶ 1. Jay Dawkins appeals his conviction for the murder of Debra Webb Brooks from the Second Judicial District of the Circuit Court of Bolivar County to this Court. Dawkins bases his appeal on the belief that the following reversible errors occurred at trial
I. THE EVIDENCE ADMITTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE JURY VERDICT.
II. THE TRIAL COURT ERRED BY ALLOWING A WITNESS FOR THE STATE TO REFRESH HIS RECOLLECTION BY REVIEWING HIS PRIOR WRITTEN STATEMENT.
III. THE TRIAL COURT ERRED IN ALLOWING AUTOPSY PHOTOGRAPHS OF THE VICTIM TO BE ADMITTED AND PUBLISHED TO THE JURY BECAUSE THEY WERE MORE PREJUDICIAL THAN PROBATIVE.
¶ 2. Upon a thorough review of the record, we find no evidence of reversible error and affirm the conviction and sentence of the lower court.
FACTS
¶ 3. Debra Webb Brooks worked for Cleveland Glass and Paint as a delivery driver. She drove a specific route each day delivering orders to customers in every part of the Mississippi Delta, including some in Oak Grove, Louisiana. Around ten o’clock on the morning of Friday, August 9, 1996, Brooks took one of the two black delivery trucks and drove her route to deliver her scheduled orders. She never returned.
¶ 4. Jay Dawkins, a former employee of Cleveland Glass and Paint, knew Brooks from their previous working relationship. On the morning of August 9, 1996, Daw-kins and his sixteen-year old cousin, Joseph Brock Bailey, drove to Oak Grove, Louisiana in Dawkins’s red Nissan 300ZX in search of employment. They arrived at Fast Glass in Oak Grove and Dawkins spoke with the manager, Larry McEntire, about the possibility of employment while Bailey waited in the car. As they were getting ready to leave, Brooks arrived at the shop to deliver an order to McEntire. The store manager observed Dawkins speaking with Brooks for approximately five minutes, but could not hear the content of their conversation.
¶ 5. After leaving the shop in Oak Grove, Dawkins and Bailey drove back to Cleveland. During the drive, Dawkins told Bailey that Brooks gave him twenty dollars to buy her some marijuana. In Greenville, Dawkins spent this money on gasoline. After visiting with friends in town, Daw-kins and Bailey drove to Shaw-Skene Road around four o’clock in order to meet Brooks at a church off to the side of the road. Brooks failed to arrive as scheduled, so Dawkins and Bailey backtracked her route, a task easily accomplished by Dawkins as a former Cleveland Glass and Paint employee, and met her on a “turn row” south of the church off of Shaw-Skene Road.
¶ 6. Dawkins and Brooks got out of their respective vehicles while Bailey sat in Dawkins’s red Nissan. Dawkins and Bailey spoke for approximately thirty seconds and walked toward Dawkins car where he told her that he did not have marijuana. As Brooks turned to leave, Bailey heard a bottle break and looked around to see Dawkins holding Brooks against the black delivery truck as she was bleeding and crying. Dawkins then retrieved a foot-long metal pole-shaped object from his car and began to beat Brooks about the head with it. Dawkins ordered Brooks into a near-by ditch. Brooks refused, fearing *1273 Dawkins would hit her again. Promising not to hit her if she complied, Dawkins forced Brooks to crawl forward and roll into the ditch.
¶ 7. Bailey, who testified that he had no knowledge that Dawkins intended to do this, emerged from his crouched position behind Dawkins car, where he had been crying apparently paralyzed with fear. He walked over to the edge of the ditch to find Dawkins holding Brooks underwater. Upon pulling her head above water level, Dawkins slit her throat with a box cutter. Dawkins then pushed Brooks’ body onto the side of the bank in a effort to keep her from floating away. After Dawkins emerged from the ditch, Bailey pointedly asked what Brooks did to reap this fate. Dawkins replied, “She narced on me.” Dawkins believed that Brooks had reported him to the authorities for selling drugs, although it should be noted that not one shred of evidence offered at trial supported this allegation.
¶ 8. Dawkins then got into the black delivery truck and ordered Bailey to follow him in the red Nissan as they drove toward Pace Dam. Near the dam, Dawkins pointed the truck towards a ditch, stopped and got out of the truck leaving it in gear, and allowed the truck to drive itself into the ditch. Dawkins put Brooks purse and his wet clothes in the trunk of his car and told Bailey to tell anyone who asked that Dawkins got wet by falling off of a pier in the country. The two boys returned to the house they shared in town, showered and went to bed.
¶ 9. The local police department initiated an investigation into the whereabouts of Brooks when her supervisor at Cleveland Paint and Glass called to report that she had not returned from her route in the company truck. Soon thereafter, Brooks’s body was recovered, and the leads developed in the search for Brooks and the missing truck led to the arrest and indictment of Dawkins and Bailey for Brooks’s murder.
LEGAL ANALYSIS
I. THE EVIDENCE ADMITTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE JURY VERDICT.
¶ 10. Dawkins alleges that the evidence presented to the jury at trial was insufficient to support his conviction for the murder of Brooks. In reviewing the sufficiency of the evidence, the Mississippi Supreme Court held:
In judging the sufficiency of the evidence ... the trial judge is required to accept as true all of the evidence that is favorable to the State, including all reasonable inferences that may be drawn there from, and to disregard evidence favorable to the defendant.
Noe v. State, 616 So.2d 298, 302 (Miss.1993). An appellate court may reverse only where “the evidence so considered is such that reasonable and fair minded jurors could only find the accused not guilty.” Pinkney v. State, 538 So.2d 329, 353 (Miss.1988).
¶ 11. The eyewitness testimony of Brock Bailey at trial related in detail the events of that August evening. Brock testified as to the manner in which Dawkins inflicted those injuries on Brooks and finally caused her death by drowning her. This testimony was corroborated by a forensic pathologist who testified that all of the lacerations and wounds on Brooks’s body were consistent with the type of injuries that would result from Bailey’s version of the attack. Several witnesses testified at trial that they saw the red Nissan, black truck, and two boys at the scene of the crime.
¶ 12. In Williams v. State, the court held that jurors may accept or refuse testimony of witnesses stating “it is not for this Court to pass upon the credibility of witnesses and where the evidence justifies the verdict, it must be accepted as having been found worthy of belief.” Williams v. State, 427 So.2d 100, 104 (Miss.1983). The jury weighed the evidence, believed the State’s witnesses, and convicted Dawkins.
*1274 II. THE TRIAL COURT ERRED BY ALLOWING A WITNESS FOR THE STATE TO REFRESH HIS RECOLLECTION BY REVIEWING HIS PRIOR WRITTEN STATEMENT.
¶ 13. Dawkins believes that because the trial court allowed the State to question a witness in regard to a previous statement without showing the necessity of refreshing his recollection, this Court should find reversible error. We disagree, believing that the exchange between the State and Bailey was not an attempt to refresh his recollection, but rather impeach his testimony with a prior written statement.
¶ 14. “Before a party calling a witness may impeach that witness, the proper predicate must be laid.” Cooper v. State Farm Fire & Cas. Co., 568 So.2d 687, 691 (Miss.1990). . In laying the predicate to introduce prior inconsistent statements of a witness, the questions should include whether or not on a specific date, at a specific place, and in the presence of specific persons, the witness made a particular statement. Carlisle v. State, 348 So.2d 765, 766 (Miss.1977). After this task has been accomplished, impeachment with prior inconsistent out-of-court statements is proper so long as the statement made in court is one relevant to the issue in the case and therefore not collateral. Cooper, 568 So.2d at 691.
¶ 15. Dawkins asserts that the following exchange is an attempt by the State to refresh the witnesses’ recollection by reviewing his prior written statement:
MR. MELLEN: Okay. And what time was that?
WITNESS: About fifteen until 4:00.
MR. MELLEN: Are you sure about that time?
WITNESS: Yes.
* * *
MR. MELLEN: May I approach the witness, Your Honor?
THE COURT: Ml right, sir.
MR. MELLEN: Do you recall, Mr. Bailey, giving a statement to Billy Joes Estes and Mr. Bogan was present?
WITNESS: Yes.
MR. MELLEN: Have you read over that statement?
WITNESS: I’m not sure. I read over it a couple of times.
* * *
(Mr. Mellen hands statement to the witness)
MR. MELLEN: You can review the entire statement if you want to, Mr. Bailey.
(Witness reviews the statement)
MR. MELLEN: Okay, having reviewed that, does that refresh your memory so far as when you went back out there to the road?
WITNESS: Yes.
MR. MELLEN: And what time was that?
WITNESS: 4:15
MR. MELLEN: What time was that — do you recall making a contrary statement in that statement there?
WITNESS: No.
MR. MELLEN: Okay. Did you go out to a church?
WITNESS: Yes.
MR. MELLEN: What time was that?
WITNESS: Right at 4:00.
MR. MELLEN: Okay. I’m going to hand this back to you and refer to that answer that you gave at the very top up there.
(Witness reviews statement)
MR. MELLEN: Does that refresh your memory?
WITNESS: Yes.
*1275 MR. MELLEN: What time then did you go out there around a church?
WITNESS: Around 4:00
MR. MELLEN: Is that contrary in that statement?
WITNESS: Yes.
MR. MELLEN: And what time did you tell the investigator you went out there?
WITNESS: I’m not sure.
MR. MELLEN: Well, is the statement correct or incorrect?
WITNESS: It’s correct.
* * *
¶ 16. It is clear from the record that, regardless of the language used by the prosecutor and the trial judge that the statement was being used to impeach Bailey’s testimony on the witness stand with a prior inconsistent statement. Although Bailey was the State’s witness, he was also Dawkins’s relative and a participant in the crime. It is not unusual in such circumstances for there to be minor inconsistencies in the testimony at trial from a less than cooperative witness. It was obvious the State was surprised by its own witness because when Mr. Mellen resumed questioning, the trial judge cautioned him about continuing to question his witness in a “cross-examination type tone.” Wharton v. State, 734 So.2d 985, 987 (Miss.1998). The State used Bailey’s statement to set the record straight when surprised by his answers on the stand. The State met the Carlisle factors by asking whether Bailey remembered making a statement to the police officers, and he responded that he did. The statement was given at the time of his arrest, and it was certainly relevant to Dawkins’s defense. There was no error in allowing the State to use the statement to question Bailey in this instance nor anywhere else in the record.
III. THE TRIAL COURT ERRED IN ALLOWING AUTOPSY PHOTOGRAPHS OF THE VICTIM TO BE ADMITTED AND PUBLISHED TO THE JURY BECAUSE THEY WERE MORE PREJUDICIAL THAN PROBATIVE.
¶ 17. Dawkins final complaint about his trial revolves around the trial court’s decision to admit certain crime scene and autopsy photographs into evidence. Daw-kins believes that these photos were used to unnecessarily inflame the jury. An evi-dentiary hearing was held on the matter and of the fifteen photos offered into evidence by the State, the trial judge only allowed seven citing the duplicate nature of the photographs. While none of the photographs showed the autopsy taking place, the others showed the wounds sustained by the Brooks in the attack and the location where her body was found.
¶ 18. The standard of review on this issue is well settled. Our supreme court has held that the admissibility of photographs rests within the sound discretion of the trial court. Jackson v. State, 684 So.2d 1213, 1230 (Miss.1996) The decision of the trial judge will not be overturned unless there has been an abuse of discretion. Westbrook v. State, 658 So.2d 847, 849 (Miss.1995). A trial judge’s discretion runs toward almost unlimited admissibility in regard to photographic evidence regardless of the gruesomeness, repetitiveness, and the extenuation of probative value. Hart v. State, 637 So.2d 1329, 1335 (Miss.1994) (quoting Noe v. State, 616 So.2d 298, 303 (Miss.1993)).
¶ 19. In Westbrook v. State, 658 So.2d 847, 849 (Miss.1995), the Mississippi Supreme Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, the location of the body and cause of death, or supplement or clarify witness testimony. The photographs at issue accurately depict the wounds suffered by Brooks and the location of her body at the scene of the crime. These photos also serve as corroboration for the testimony of the forensic pathologist called by the *1276 State. The photos were corroborative with testimony of the witnesses and, thus, were relevant without being unduly prejudicial.
¶ 20. THE JUDGMENT OF THE BOLIVAR COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE TO SERVE A TERM OF LIFE IN CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TO RUN CONSECUTIVE TO ANY AND ALL PREVIOUS SENTENCES IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO APPELLANT.
KING AND SOUTHWICK, P.JJ., IRVING, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. McMILLIN, C.J., CONCURS IN RESULT ONLY. MYERS, J., NOT PARTICIPATING.