# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00371-COA

TOMMY VAN YATES, JR. A/K/A TOMMY YATES                    APPELLANT

v.

STATE OF MISSISSIPPI                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2024 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/18/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial in the Lowndes County Circuit Court, Tommy Van Yates Jr. was convicted of burglary of a dwelling. On appeal, Yates argues that the trial court erred by sustaining a hearsay objection to certain testimony by his father and that the evidence is insufficient to support his conviction. We find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     In May 2022, Keith and Bonnie Thames hired Tommy Van Yates Jr. to replace the roof on a small office building at the Thameses' primary residence in New Hope. The Thameses had known Yates for more than ten years, and he had completed several other

small projects at various properties they owned. Prior to May 2022, Yates had completed multiple projects at the Thameses' "river house," their vacation home on Riverside Drive on the Tombigbee River in Lowndes County. However, the Thameses had not contracted with Yates to do any work at the Riverside house in May 2022. On May 12, 2022, the Thameses reported a burglary of the Riverside house and informed the Lowndes County Sheriff's Department that they believed Yates was responsible.

¶3. The Riverside house was elevated on stilts, with a furnished living area on the upper level and an enclosed garage with a storage room on the lower level. A stairway on the garage level led to a keypad-locked door accessing the upper-level interior. Prior to the May 2022 burglary, the code had not been changed since 2017. At trial, the Thameses testified that they and their guests regularly stayed at the Riverside house for days or weeks at a time.

¶4. On April 27, 2022, Bonnie had texted Yates to ask if he could do some work at the Thameses' primary residence in New Hope. On May 3, Yates texted Bonnie to say he would be over that day to start work. The next text exchange between Yates and the Thameses occurred on May 18, when Yates requested a check to pay for materials.

¶5. Leading up to the burglary on May 12, Yates, with the help of his father, Tommy Van Yates Sr. (Yates Sr.), had been replacing the roof on a small office building at the Thameses' New Hope residence. Bonnie testified that during that time, she had told Yates that she and Keith would both be out of town at a graduation in Jackson on May 12.

¶6. On May 12, around 7 a.m., Bonnie received a cell phone alert from the Riverside

2

house's upstairs Ring security camera notifying her of movement in the house. The Ring camera video recordings presented at trial show a man walking through the house in the dark. He opens and closes the refrigerator and freezer doors and rummages through the kitchen drawers with a flashlight. He is next seen walking through the living room with a grocery sack; he then moves out of sight of the camera, and then he walks back through the living room before exiting the home.

¶7. Bonnie viewed several recordings from the Ring camera and briefly visited the house. She testified that the house's electricity was functioning without issue. Upon viewing the Ring videos, she recognized Yates as the man in the video. When Bonnie returned home, she recorded a video of Yates at her New Hope residence in the same hat and shirt as in the Ring videos. The video Bonnie took of Yates at the New Hope residence was also admitted into evidence and played for the jury at trial.

¶8. Later that day, the Thameses reported the burglary to the Lowndes County Sheriff's Department. On May 13, Deputy Richard Brantley responded to the reported burglary, gathered information from the Thameses, and reviewed the footage from the Ring camera as well as the video Bonnie had taken of Yates at her New Hope residence. At trial, Deputy Brantley testified that he recognized Yates as the individual in the videos.

¶9. As part of their investigation, Deputy Brantley and Detective Drew McCain conducted a walkthrough of the residence with the Thameses, inspecting the areas where Yates had been seen rummaging in the Ring videos. At trial, Bonnie reported that a set of keys and a

3

bottle of Gabapentin pills prescribed to her dog were missing from the kitchen drawers, and an amethyst crystal was missing from a crystal set displayed on the kitchen bar.

¶10.    On May 20, 2022, after Yates finished his work at the Thameses' primary residence, Detective McCain arrested Yates for burglary of the Riverside house.  Yates waived his *Miranda*[1] rights and agreed to a recorded interview, which was admitted into evidence and played for the jury at trial.  Yates admitted that he had entered the Riverside house.  He explained that he went there to retrieve leftover plywood from a previous job and stated, "Mr. Keith told me to get anything I needed."  When asked if he had permission to enter the Riverside house, Yates said, "I mean, not specifically." He initially denied using a flashlight, but after McCain told him there was a recording of him in the house with a cell phone flashlight on, he stated, "I don't remember having the light on, but I may have."

¶11.    In the interview, Yates explained that he searched for the keys to the storage room because he believed it contained the leftover plywood.  He said he also retrieved a garbage bag and used the bathroom.  Yates stated, "[Keith] said—same as he always does—you know where everything is, use anything . . . that you need to."  Yates also said, "Mr. Keith sat there and told me in front of my dad that day . . . , 'If there's anything you need, you know where everything is at.'"

¶12.    At trial, Yates testified that on the morning of May 12, he used the access code to enter the Riverside house through the stairway door on the garage level.  He maintained that

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

he went to the Riverside house to retrieve leftover plywood for the roofing project at the New Hope residence, and that he looked through the house and drawers in search of the keys to the storage room containing the plywood.

¶13.    Yates sought to explain his actions in the Ring recordings. He testified that he flipped the kitchen light switch, but the light did not turn on. He said he then exited the room and flipped the breakers and, upon returning, opened the refrigerator and freezer doors to check for electricity and see whether food had defrosted. Yates explained that he used his phone's light to look for the keys to the downstairs storage room because the kitchen lights were not working. He said he placed a couple of keys and three rubber bands on the counter.

¶14.    Yates further explained that the videos showed him carrying a Walmart bag with a black garbage bag inside, which he testified he used—along with the rubber bands—to clean up trash in the front yard of the Riverside house. He denied that the bag contained keys, a rock, or Gabapentin, and he testified that he did not enter the house with the intent to steal anything. Yates testified that he did not find the keys to the storage room, so he left.

¶15.    When asked what he meant when he told Detective McCain that Keith had "not specifically" given him permission to enter the Thameses' properties, Yates testified that Keith "gave me the same permission that he always gives me. 'Van, you know where everything is at. My house is your house.'" Yates testified that this permission extended to the Thameses' property known as "the pits," their New Hope residence, and any other properties where he had worked.

5

¶16.    Yates testified that he had not been given specific permission to enter the Riverside house because he had "been given free range this entire time." He stated his permission "was implied," and he "didn't have to" ask for specific permission. When questioned about whether he had ever asked for permission to go in the Riverside house in the past, Yates testified that he "always did." He testified, though, that the Thameses never told him he could not access the Riverside house.

¶17.    Yates admitted he never asked for permission to enter the Riverside house on May 12. When asked why he did not call or text the Thameses for permission to enter the home, Yates explained, "It was 6:30 in the morning. I was being polite." He testified that he had "periodic[ally]" gotten materials from the storage room at the Riverside house, although Keith had never "specifically" given him permission to do so. He said that Bonnie had told him multiple times in the past, "[Y]ou don't have to call me every time you go down there."

¶18.    The defense called Yates Sr. to testify at trial. On direct examination, he testified that he had been assisting Yates with the roofing project at the Thameses' primary residence on or about May 12 and had communicated with Keith several times during the project. The following exchanges then occurred:

Q.      [D]id [Keith] ever tell you anything about your materials that you could use on the project?

A.      Yes, he did. Do you want me to explain that?

Q.      Yes. What did he tell you?

A.      I can't remember word-for-word. But this is how I got it.

6

[ASSISTANT DISTRICT ATTORNEY] LANG: Your honor, I'm going to object. This is hearsay. It's not reliable.

[The court excused the jury, and the following occurred outside the jury's presence:]

THE COURT: Your objection is . . . hearsay?

MR. LANG: Yes, Your Honor.

THE COURT: . . . Mr. Clemons [(defense counsel)], why are you offering this?

MR. CLEMONS: I'm offering this to show what knowledge my client as well as his father had about what they could or could not do with respect to going into the residences to obtain materials.

THE COURT: [I]t seems to me that it's sort of being offered for some type of—almost like an impeachment.

MR. CLEMONS: I suppose[], Your Honor, for lack of a better word.

THE COURT: [I]f that's the case, the foundation has not been laid to ask this witness hearsay questions or questions that will require a hearsay source at this point. So, I'm going to sustain[] the objection at this point and time.

¶19. Yates Sr. subsequently testified that most of the materials for the roofing project were obtained from Hollis Roofing, and lumber may have been obtained from Cash & Carry or New Home Building. He testified that he never went to any of the Thameses' houses to get materials and never observed Yates get material from any of the houses. He said that when not actively being used, the materials were stored on a trailer at the job site that he and his son could freely access. He testified that he had not been "told that [he] did not have access to anywhere else on the job site."

7

¶20.    At trial, the Thameses explained that they provided Yates with the access code to the Riverside house when he had worked there previously.  Bonnie testified that they permitted Yates to access the Riverside house only "when he was doing jobs."  According to Keith, they never told Yates he was not permitted to enter the property, but they "assumed that when he finished the job out there, that he would not enter the [Riverside house] again."

¶21.    Bonnie testified that there was no plywood in the storage room of the Riverside house in May 2022.  Keith testified that no materials were stored in the storage room in May 2022, that the Thameses had not given Yates permission to store anything there, and that the storage room had always been unlocked.  Keith said the storage room contained "garden tools and two by fours, whatever we needed to do our jobs and things like that but nothing major," and Bonnie said it contained "a wooden bench," "rakes," some "short little pieces of wood," and a gun for shooting snakes.

¶22.    At trial, the Thameses explained how the materials for each job were procured.  For each project, Yates would tell them what materials he needed, and they would let him know whether they already had any of the materials on hand.  Bonnie testified that plywood was stored in a trailer at their residence in New Hope, and additional supplies were kept at their "Airline Manufacturing" property.  If a project required material from the storage trailer, the Thameses would leave the trailer unlocked for Yates.  If Yates needed material from the Airline Manufacturing property, Bonnie testified that "[i]t could be either transported by Keith on a trailer or [Yates] would come with a trailer and get it with us."

8

¶23. Bonnie testified that Yates never called or texted her about going to the Riverside house, looking for plywood or keys, or finding the electricity malfunctioning. According to Bonnie, in the past, Yates had never obtained materials from any of their properties or used a code to retrieve materials without texting her or Keith first. Bonnie also testified that Yates did not threaten or trick her in order to get the code to the Riverside house, and he did not promise something of value that he did not deliver in order to get the code.

¶24. When asked if he told the Thameses that he had been to the Riverside house or that the electricity had been out, Yates testified that he called Bonnie and Keith as soon as he arrived at their New Hope residence after leaving the Riverside house, but neither answered. Yates ultimately did not tell the Thameses that he had been to the Riverside house or about any electrical problems. He testified that he did not inform them that he had been to the Riverside house because it was "not unusual," and he did not tell them about the alleged electrical issue because he "didn't get to talk to them."

¶25. The jury found Yates guilty of burglary of a dwelling, and the court sentenced him to fifteen years in the custody of the Department of Corrections, with five years suspended, ten years to serve, and five years of post-release supervision. Yates filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

## ANALYSIS

¶26. On appeal, Yates argues (1) that the trial court erred by sustaining the State's hearsay objection to Yates Sr.'s testimony, as discussed above, and (2) that the evidence is

9

insufficient to support his conviction.

## I. Yates Sr.'s Testimony

¶27.     Yates argues that the trial court erred by prohibiting Yates Sr. from testifying about what Keith allegedly told him regarding getting materials for the roofing project. Yates argues that Yates Sr.'s testimony was not hearsay because it was offered to show its effect on the listener, was admissible to show both Keith's and Yates's states of mind concerning materials, and was admissible to impeach Keith's testimony. He argues that exclusion of the statement "was incredibly prejudicial to the defense." The State argues that Yates failed to preserve this issue because he failed to make an offer of proof and because the substance of the excluded testimony cannot be gleaned from the record.

¶28.     "This Court reviews the trial court's decision to admit or exclude evidence under an abuse of discretion standard of review." *Deeds v. State*, 27 So. 3d 1135, 1140-41 (¶15) (Miss. 2009) (quoting *Smith v. State*, 986 So. 2d 290, 295 (¶12) (Miss. 2008)). This Court "will affirm the trial court's ruling unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice . . . the accused in a criminal case." *Id.* at 1141 (¶15) (quotation marks and brackets omitted).

¶29.     "[T]o preserve a claim that the trial court erred by excluding evidence, the proponent of the evidence must 'inform[] the court of its substance . . . , unless the substance was apparent from the context.'" *Randall v. State*, 395 So. 3d 458, 463 (¶20) (Miss. Ct. App. 2024) (citing MRE 103(a)(2)). This Court has consistently required a proffer of excluded

10

evidence, stating:

> Generally, when a party seeks to offer evidence which in turn is excluded by the trial court, before we will consider the matter on appeal the party must have somehow placed in the record the nature and substance of the proffered evidence for our consideration. When testimony is excluded at trial, a record must be made of the proffered testimony in order to preserve the point for appeal.

*Evans v. State*, 294 So. 3d 664, 667 (¶12) (Miss. Ct. App. 2020) (quoting *Harrell v. State*, 179 So. 3d 16, 21 (¶15) (Miss. Ct. App. 2014) (quoting *Barron v. State*, 130 So. 3d 531, 539-40 (¶32) (Miss. Ct. App. 2013))).

¶30. Here, Yates failed to make a proffer of Yates Sr.'s excluded testimony, and the substance of his testimony is not apparent from the record. Yates's counsel did not place in the record any statement by Yates Sr. regarding anything that Keith allegedly said. In addition, the record does not tell us what Yates Sr. would have remembered hearing Keith say. "Without a proffer this Court cannot know what testimony was excluded." *Young v. State*, 194 So. 3d 904, 908 (¶16) (Miss. Ct. App. 2016) (quotation marks omitted). Because Yates failed to make an adequate proffer to preserve this issue for appeal, his claim of error is procedurally barred.

## II. Sufficiency of the Evidence

¶31. Yates also argues that the evidence presented at trial was insufficient to support his burglary conviction. Therefore, he argues that we must reverse his conviction and render a judgment of acquittal. Specifically, Yates argues that no reasonable juror could find beyond a reasonable doubt that he did not have at least implied permission to enter the Riverside

11

house or that he entered the house with the intent to steal.

¶32.     We review challenges to the sufficiency of the evidence de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). "We view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime." *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010) (quotation marks and emphasis omitted). "[A]ll credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole*, 46 So. 3d at 293-94 (¶20). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all elements of the offense." *Williamson v. State*, 375 So. 3d 1158, 1167 (¶19) (Miss. Ct. App. 2023) (citing *Poole*, 46 So. 3d at 293-94 (¶20)).

¶33.     Burglary of a dwelling is the "breaking and entering the dwelling house . . . of another . . . with intent to commit some crime therein." Miss. Code Ann. § 97-17-23(1) (Rev. 2020). As the Mississippi Supreme Court has explained,

> the elements of burglary are (1) breaking and entering the dwelling house . . . of another (2) with the intent to commit *some crime* therein. The crime of burglary does not contain two separate and distinct "subcrimes." Rather, the *intent* to commit some crime, be it a felony or misdemeanor, is simply an element of the crime of burglary. The State is not obligated to prove that the accused actually committed the underlying offense of burglary. Only the intent

12

need be proven to establish the second element of the crime of burglary.

*White v. State*, 195 So. 3d 765, 768-69 (¶11) (Miss. 2016) (brackets, citations, and quotation marks omitted).

¶34. As to the first element of the crime of burglary, "there can be no breaking, and therefore there is no burglary where the occupant of a house, or an agent or servant having authority, expressly or impliedly invites or consents to the entry." *Bowman v. State*, 283 So. 3d 154, 162 (¶24) (Miss. 2019) (quoting *Holderfield v. State*, 215 Miss. 564, 569, 61 So. 2d 385, 386 (1952)). However, "[t]he State is not required to prove lack of consent as a required element of burglary." *Body v. State*, 318 So. 3d 1104, 1109 (¶18) (Miss. 2021). "Instead, consent is an affirmative defense to the charge of burglary rather than an essential element of the offense." *Bowman*, 283 So. 3d at 162 (¶25) (brackets and quotation marks omitted). "[A]n actual breaking [is] any act or force, however slight, employed to effect an entrance through any usual or unusual place of ingress, whether open, partly open, or closed." *Body*, 318 So. 3d at 1110 (¶22) (brackets and quotation marks omitted).

¶35. In this case, the State presented sufficient evidence for a rational jury to find that Yates broke into and entered the Riverside house. Bonnie, Keith, and Yates testified that Yates had not been hired to do any work at the Riverside house in May 2022, and the Thameses testified that Yates had not been given permission to enter the Riverside house during that time. Yates admitted that he used the door code previously given to him by the Thameses to gain entry to the home, and the jury evidently accepted the Thameses' testimony

that Yates's permission to use the access code—and to enter the Riverside house—was limited to times when he was actively working there or when he had received their prior permission. Yates even testified that in the past, he had "always" asked for permission to enter the Riverside house. However, Yates did not ask for permission to enter the Riverside house on May 12, nor did he subsequently inform the Thameses that he had entered the house. The jury clearly found Yates's testimony insufficient to support his claim that he had implied permission to freely enter the Thameses' property at any time.

¶36. Based on the evidence presented at trial, a reasonable jury also could have found that Yates broke into and entered the Riverside house with the intent to commit a crime therein—namely, to steal. On appeal, Yates argues that no reasonable jury could have found against him on this element because the evidence shows he entered with the intent "to simply get materials for the roofing project."

¶37. The jury watched three videos of Yates walking through the Riverside house in the dark while looking and rummaging through various areas of the house with a flashlight. At trial, Yates claimed that he was searching for the key to the downstairs storage room, where he believed plywood was stored, and that he used a flashlight because the electricity in the house was malfunctioning. But the jury was entitled to reject that explanation and accept the Thameses' testimony that the electricity was not malfunctioning at the Riverside house, that the storage room was always unlocked, and that there was no plywood in the storage room anyway. The jury could also doubt the explanation Yates gave at trial given its inconsistency

14

with his prior statement to law enforcement. When interviewed after his arrest, Yates initially denied using a flashlight in the house. Only when told that surveillance footage showed him using a flashlight did he admit that he might have used one. Yet, he still made no mention of any electrical issue during his interview. The jury could reasonably find it implausible that Yates would forget such a key detail just days after the incident, only to recall it years later at trial.

¶38. The videos showed Yates moving through the house in the dark, rummaging through drawers, and walking out of view with a grocery sack. Bonnie testified that a set of keys, a bottle of Gabapentin, and an amethyst crystal were missing from the areas where Yates had been seen rummaging, and she testified that those items still had not been recovered as of trial. In addition, the Thameses and Yates Sr. testified that the materials Yates needed for the roofing job were stored in a trailer in New Hope, not at the Riverside house. Based on all this evidence, the jury could reasonably find that Yates's stated reason for entering the house was false and that he instead entered with the intent to steal. Viewing the totality of the evidence in the light most favorable to the State, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Yates entered the Riverside house without permission and with the intent to commit a theft. Accordingly, there was sufficient evidence to support Yates's burglary conviction.

¶39. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS,**

15

**J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**